```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         GAINESVILLE DIVISION

 3
     AF HOLDINGS, LLC,              )    Docket Number
 4                                 )    2:12-CV-262-WCO
                                   )
 5                  v.             )
                                   )    Rome, Georgia
 6                                 )    July 2, 2013
     RAJESH PATEL                  )
 7                                 )

 8
                     TRANSCRIPT OF MOTIONS FOR SANCTIONS
 9             BEFORE THE HONORABLE WILLIAM C. O'KELLEY
                     UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES OF COUNSEL:

12
     For Plaintiff:              MR. JACQUES NAZAIRE
13                               ATTORNEY AT LAW
                                 Suite 300
14                               125 Town Park Drive
                                 Kennesaw, Georgia 30144
15                               (404) 923-0529
                                 Nazaire.jacques@gmail.com
16

17   For Defendants:            MR. BLAIR CHINTELLA
                                 BLAIR CHINTELLA, ESQ.
18                               2483 Shoals Terrace
                                 Decatur, Georgia 30034
19                               (404) 579-9668
                                 BChintel1@gmail.com
20

21   Official Court Reporter:   ALICIA B. BAGLEY, RMR, CRR
                                 600 First Street, S.W.
22                               Rome, Georgia 30161
                                 (706) 378-4017
23

24          Proceedings recorded by mechanical stenography, transcript
                         Produced by computer
25
```

```
 1                    P R O C E E D I N G S

 2            [in Gainesville, Hall County, Georgia; July 2, 2013;

 3                     10:00 a.m.; in open court.]

 4         THE CLERK:  Calling for motion hearing on sanctions.  Civil

 5   Action 2:12-CV-262.  AF Holdings, LLC vs. Rajesh Patel.

 6         Will counsel please state their name for the record.

 7         MR. NAZAIRE:  Jacques Nazaire, Your Honor, for AF Holdings.

 8         MR. CHINTELLA:  Blair Chintella, Your Honor, for Mr. Patel.

 9         THE COURT:  You're Blair Chintella?

10         MR. CHINTELLA:  What's that, Your Honor?

11         THE COURT:  You're Blair Chintella?

12         MR. CHINTELLA:  Yes, sir.

13         THE COURT:  Okay.  All right.  Counsel, this matter has gotten

14   extensively protracted even though there's, really, few motions

15   filed.

16         As I always do, I'll read you what the computer prints out as

17   pending motions in this case.  That is, a motion that is Docket Item

18   Number 16, a Motion for Sanctions filed by the defendant in this

19   case; Docket Item Number 21, a Motion for Sanctions filed by the

20   plaintiff in this case; and Docket Item Number 30, another Motion for

21   Sanctions filed by the defendant in this case.

22         Does that represent all of the pending motions for matters

23   that are pending in this case?

24         MR. CHINTELLA:  Docket Item Number 30, Your Honor, also

25   includes a --
```

 1          THE COURT:  Beg your pardon?

 2          MR. CHINTELLA:  Docket Item Number 30, Your Honor, also

 3  includes a Motion to Strike in the same motion.

 4          THE COURT:  Is that contained in the same motion?

 5          MR. CHINTELLA:  Yes, Your Honor.

 6          THE COURT:  All right.  So there's not another motion -- a

 7  separate motion other than Number 30?

 8          MR. CHINTELLA:  There's no separate filing, Your Honor.

 9          THE COURT:  All right.  Mr. Nazaire.

10          MR. NAZAIRE:  Yes, Your Honor, that is correct.  That is

11  correct.

12          THE COURT:  All right.  Okay.  Defendant was the initial

13  movant and the multiple movant so you may proceed with your

14  presentation.

15          MR. CHINTELLA:  Your Honor, this is my second time in front of

16  you, so I'm glad to be back.  And what we have here --

17          THE COURT:  When was the first?

18          MR. CHINTELLA:  Sorry, Your Honor?

19          THE COURT:  When was the first?

20          MR. CHINTELLA:  It was an in-chambers meeting about a year and

21  a half ago, it was regarding these cases as well, and you had some

22  poignant questions about wireless routers and how they can be hacked

23  and their range and password protection.

24          What we're dealing with here today is the same type of case.

25  Generally speaking, these cases involve -- they start off with a

1    large John Doe lawsuit and there are multiple John Does.  I've been

2    handling these cases for approximately two years, a little over two

3    years, and they almost invariably start with a large John Doe case.

4    They're never initially filed against individuals.

5           Part of the reason for that is because the plaintiff in these

6    cases are only able to detect an IP address.  I brought with me today

7    an expert named Andrew Norton who if -- throughout this hearing, if

8    there's any technical questions, I can attempt to qualify him as an

9    expert on IP addresses or any other technical things that we're

10   discussing today.  Mr. Norton is sitting right there in the tie

11   there.

12          Essentially the cases start off that way and they're almost,

13   invariably, in a foreign or a distant jurisdiction, a state far away

14   from most of the John Does.  Back in 2010 these cases began being

15   filed in D.C.  As Your Honor can probably imagine, the primary reason

16   is forum shopping.  So plaintiffs will select a forum that is distant

17   and cost prohibitive for anyone to challenge any of the subpoenas

18   that are sent out.

19          What happens is that subpoenas are issued prior to the Rule 26

20   conference.  The requests for the subpoenas are relied upon technical

21   reports.  In preparing for this hearing I determined -- or I found

22   out the case that preceded this one where my client was named in the

23   case, as designated by his IP address, in the District of Columbia.

24   And once -- in the District of Columbia, at any rate, the request for

25   discovery almost invariably granted.  I'm not aware of a single case

1  where they have not been granted.

2       So once the information is obtained -- depending on the law

3  firm, they employ different strategies.  But, overall, law firms will

4  attempt to contact the people once they have their information and

5  basically attempt to negotiate, pressure, or however you want to put

6  it regarding settlement and demand letters are sent out.  In most

7  cases, phone calls are made sometimes.

8       The scope of the information that is obtained is more than

9  what is required to just determine jurisdiction alone.  So a person's

10 name, address, phone number, email, all that information is obtained

11 and they're contacted on multiple avenues and then attempted --

12 pressured -- I like to say pressured, because I've spoken with a lot

13 of clients about these cases and they feel pressured, basically, into

14 settling.  And the settlement demands typically range anywhere from

15 2500 to 4,000 to 4500 or even higher.

16      The demand letters are very misleading.  It's very high

17 pressure.  They assert that if you resist settlement, then you could

18 end up facing $150,000 in damages or copyright damages.  They omit

19 that it could have been somebody else in the household or it could

20 have been an unsecured network and they say you may be liable.  Those

21 are the types of things that occur at that stage.

22      Now, with this particular law firm handling other cases.

23 Prenda is the current law firm, but Prenda has a long history and

24 it's, really, an amalgamation of multiple entities and multiple

25 people and it's truly a nationwide, sort of, operation.  I would

1  argue that it's more of a partnership or an enterprise among all the

2  people involved rather than each having its separate role and

3  following its separate corporate structure.

4       It began in 2010.  I referenced this in the first motion,

5  Docket Item Number 16.  It basically begins with a story about how

6  this particular firm got started.  It started with Steele Hansmeier,

7  which is a PLLC formed in Minnesota.  It was formed by Paul Hansmeier

8  and the two principals were John Steele and Paul Hansmeier who met in

9  law school.

10       THE COURT:  Well, now, let's back up a minute.  You're getting

11  off into a lot of things that -- you've been talking for quite a

12  while --

13       MR. CHINTELLA:  I apologize.

14       THE COURT:  -- and you've yet to even say what your motion is.

15  You're talking about a Prenda Law Firm and I'm looking at the

16  complaint and I don't see a Prenda Law Firm listed anywhere.  This

17  complaint is signed by Mr. Nazaire.  It doesn't say Prenda Law Firm

18  anywhere on it.  Neither does it say that on the docket sheet.

19       MR. CHINTELLA:  Well, that's one of the issues we have in this

20  case and it's one of the reasons that we feel sanctions are justified

21  is that the plaintiff has failed to file a corporate disclosure

22  statement.  The form required in Georgia, Northern District at least,

23  is more stringent than just the federal rule standard, so it requires

24  disclosure of anyone with an interest in the litigation, not just

25  someone --

1      THE COURT:  Well, I understand that.  You're doing exactly

2 what I said you had not done already.  I've given you a chance to

3 present your case first.  You've yet to tell me anything about a

4 motion.  I identified that you have two motions pending and you've

5 yet to describe them, describe what they allege or what you're

6 seeking.  You just started into a historical narrative of what,

7 quote, these people are doing.  Well, I shouldn't put quotes around

8 it, but what these people are doing.

9      MR. CHINTELLA:  Yes, Your Honor.

10      THE COURT:  Which includes the Prenda Law Firm and somebody

11 else.  Now, I'll have to say from the pleadings, the other side is

12 worse about that than you.

13      MR. CHINTELLA:  Thank you, Your Honor.

14      THE COURT:  I think you ought to -- addressing this matter

15 legally, you ought to start off by setting forth what your motion is,

16 what it's predicated on and come from that rather than trying to give

17 a political historical narrative.

18      MR. CHINTELLA:  Thank you, Your Honor.

19      Our first motion, Docket Item Number 16, is essentially

20 alleging -- or arguing that attorneys' fees are appropriate in this

21 case as of the filing of the case, because it was filed in bad faith

22 under the exception to the America Rule for Attorneys' Fees.

23      Motion Number 1 -- or, excuse me, 21 is by the plaintiff and

24 it's basically a retaliatory sanctions motion claiming that we have

25 no basis for a sanctions motion.

 1           Number 30 is just reiterating a lot of the stuff.  Also

 2   objecting to a lot of the stuff in their motion that we've already

 3   filed objections to as irrelevant.  I could go into that.  I didn't

 4   know what order the Court wanted to proceed as far as ruling on those

 5   objections.  I'm prepared to discuss the very personal attacks in

 6   some of that and defend myself or discuss the relevance of those.

 7           THE COURT:  This is part of the reason I'm trying to get you

 8   to direct your arguments to a motion and what you're asking for.  You

 9   might, as I've tried to do -- but you might try to distinguish

10   between matters that address themselves to the lawsuit and matters

11   that address themselves to personalities of the lawyers or personal

12   data -- personal matters concerning the lawyers, I should say.  All

13   right.

14           MR. CHINTELLA:  So, basically, the case was filed in bad

15   faith.  The reason for that is because of Prenda's long, long history

16   of filing these cases across the country.  Prior practices of Prenda,

17   we believe, are relevant, not only of Prenda, but of the people that

18   worked with Prenda over that historical period to show how the

19   current case fits in with that scheme, because it truly is a national

20   scheme.

21           Of the over 200 cases filed by the plaintiff across the

22   country not a single one, that I'm aware of, has ever gone past

23   discovery.  Essentially, there have been several misrepresentations

24   in this case.  The technical reports that are relied on have never

25   been tested.  They are filed by Paul Hansmeier, his brother named

1  Peter Hansmeier.

2       There's question -- there's a question over whether the

3  plaintiff actually owns the copyright.  There's a forged signature --

4  we would argue there's a forged signature on the copyright assignment

5  agreement from the original owner to the plaintiff.

6       We would also object to the authenticity of the assignor's

7  signature on there as well because of Prenda's long history of using

8  shell companies, which there's more than ample evidence of,

9  appropriating peoples' personalities.  I can give multiple examples

10  of that.

11       We would just -- we don't believe that the copyright

12  assignment is authentic.  Especially the recent statements by the

13  members of Prenda in other cases where there are -- and opposing

14  counsel has said that John Steele has ownership in AF Holdings and

15  Livewire Holdings owns -- supposedly, owns the plaintiff.  But then

16  we have contradictory statements saying that a trust based in Saint

17  Kitts and Nevis owns the plaintiff.  No corporate disclosure

18  statement has been filed here.  So we would argue that all that goes

19  to a bad faith filing where there's no way they could prove the

20  copyright ownership in this case.  So they don't have standing to

21  bring the case.

22       Essentially, my client was dismissed voluntarily because he

23  was about to put up a fight, which is what Prenda does over this long

24  history of all these cases across the country, whenever they meet

25  resistance or somebody who doesn't want to settle or is willing to

1   put up a fight.  That's the essential basis of our argument and it

2   relies a lot -- or much on the history of Prenda and the principals.

3        The connection between Prenda and this current counsel is

4   that -- first of all, in the complaint itself, it lists a Prenda

5   email address on the complaint.  So at the very bottom Brett Gibbs --

6   it says BLGibbs@wefightpiracy.com.  Wefightpiracy.com is the website

7   for Prenda, it was the website for Steele Hansmeier, the predecessor

8   to Prenda, and it is the website for Anti-Piracy Law Group, the

9   successor to Prenda.  We have evidence here that will show that John

10  Steele is the accountholder for that website and he's one of the

11  characters that are mentioned in our filings.

12       Not only that, those records will show that Alan Cooper, whose

13  signature was forged on the copyright assignment, his email address

14  was used on the records for that website.  So essentially John Steele

15  is using Alan Cooper's email address and information.  There are

16  other instances of entities across the country where Alan Cooper is

17  used by John Steele.

18       Plaintiff is based in Nevis.  Paul Hansmeier recently did a

19  deposition in California and he testified that Nevis -- or plaintiff

20  has never paid any taxes in the United States or Nevis or Saint

21  Kitts.  It does not realize revenue.  The only revenue that,

22  Hansmeier says, that it realizes is the increase in the value of its

23  assets, which are these copyrights.

24       We'll also show that it was filed in bad faith because the

25  movie itself is being marketed right now, and Hansmeier says in his

```
 1  deposition that it's not being marketed and that the plaintiff's only
 2  source of income is just from the increase in the value, but it
 3  hasn't realized it yet because of the piracy that's still ongoing.
 4  That's the basis of our argument, Your Honor.
 5         THE COURT:  Have you taken any depositions or any form of
 6  discovery in regard to these motions?
 7         MR. CHINTELLA:  We have not had the opportunity, Your Honor.
 8  The only thing we're relying on is we've had to pull a lot of
 9  information from other cases because this case was dismissed against
10  our -- you know, at the plaintiff's prerogative.
11         Initially, when this case was filed, I had a conversation with
12  opposing counsel and he initially said that he was not going to
13  oppose setting aside the entry of default.  I communicated my
14  client's willingness to basically fight this case and plaintiff's
15  counsel wanted us to agree to a dismissal with each side paying their
16  own attorneys' fees, and I want to leave that door open to my client.
17  That's where the negotiations broke down.  So they did a voluntarily
18  dismissal and we filed the Motion for Attorneys' Fees under -- at the
19  time was the only avenue I thought was available.
20         Since researching this case I have found this other case in
21  D.C., and we are considering filing a motion to open the time period
22  to file another Motion for Attorneys' Fees because this will be the
23  second dismissal of a case.  Not only that, it's a dismissal with
24  prejudice.  So we believe there are --
25         THE COURT:  Wait.  You say it's the second dismissal of the
```

 1  case.  Of this case?

 2          MR. CHINTELLA:  I'm sorry.  Under the -- I believe it's Rule

 3  42, it's the same subject matter of a case involving the same subject

 4  matter, then if that's dismissed, then a second one that is dismissed

 5  operates as an adjudication on the merits, that would be our

 6  argument.  And it's not the same party --

 7          THE COURT:  Has there been another suit filed by this

 8  plaintiff against this defendant somewhere else?

 9          MR. CHINTELLA:  The rule doesn't state it has to be the same

10  defendant.  It just says the same cause of action based on the same

11  facts.  And so the first John Doe case in D.C. was dismissed and then

12  this one was dismissed as well, we would argue that's a second

13  dismissal.  But moreover, that this dismissal was with prejudice.

14  So, really, there are two grounds to conclude that we are prevailing

15  party status under that rule.

16          So, you know, that is one option that I was not able to do at

17  the time, so we filed this motion until I found the other case.

18  There are 200 cases across the country, and these cases list these IP

19  addresses, these attachments, and so I had to go out and try to find

20  all these hundreds of cases where my client's IP address could

21  possibly have been.  So that was the process for that.

22          We would, you know, ask the Court -- or make another motion,

23  an oral motion to extend the time to file that Motion for Attorneys'

24  Fees, if the Court feels there's any question as to bad faith in this

25  case, so that the same fact of law, the same factors are considered

1  under that motion.

2       THE COURT:  Well, you presently have a motion pending --

3       MR. CHINTELLA:  Yes, Your Honor.

4       THE COURT:  -- for Sanctions which includes attorneys' fees,

5  does it not?

6       MR. CHINTELLA:  It does, Your Honor.  We would posit that the

7  bad faith standard's harder to meet than the copyright attorneys'

8  fees statute.  That's why we would suggest that.

9       We're prepared to bring forth evidence of the overview --

10  supporting the overview that I just gave in any fashion that the

11  Court finds useful, whether it be on the computer or I brought some

12  paper copies.  There's voluminous evidence in cases spread across the

13  country and I've really paired it down.

14       THE COURT:  You need to bring in evidence here, not refer to

15  evidence in other courts.  This Court's not going to operate on the

16  fact that there's evidence been introduced in the District of

17  Columbia or in California or elsewhere.  You've got to present

18  evidence here to support whatever it is you claim.

19       Now, what's your second motion?

20       MR. CHINTELLA:  The second motion -- may I step behind and

21  pull it up for Your Honor so I can make sure?

22       THE COURT:  All right.  If you're just pulling it up for me to

23  read, I've got it here for that purpose.  I was inviting your

24  argument in regard to it.

25       MR. CHINTELLA:  Our second motion, Your Honor, is -- the

 1    second motion, the gist of that motion is the argument that sanctions

 2    are justified because the plaintiff has filed pleadings in violation

 3    of the local rules.  Specifically, Local Rule 7.1, which only permits

 4    a motion, response and reply.

 5          A reply -- a response and reply were filed, but there was a

 6    mistake and, basically, to justify that mistake they just filed

 7    another document and they rehashed all the same arguments and they

 8    included more inflammatory stuff in there, which we would argue is

 9    sufficient basis by itself to impose sanctions when stuff like the

10    stuff that is included in there --  for example, mentioning --

11    referring to plaintiff's counsel -- or defense counsel as associated

12    with a terrorist organization.

13          THE COURT:  Defendant what?

14          MR. CHINTELLA:  Defendant's counsel, myself, as being

15    associated with an organization that shares terrorist goals, with an

16    organization like WikiLeaks, but not giving any examples of what

17    these terrorist goals are.

18          Mentioning, of course, a criminal record, which Your Honor is

19    obviously aware of as far as reading the memorandums.  I mean, I can

20    speak personally on those things, but professionally, after thinking

21    about it, my approach was to try to just object to the relevance of

22    it instead of respond to that stuff in the filings.  But we would

23    argue that that constitutes bad faith -- as further evidence of the

24    bad faith in these types of cases.

25          I can go through the evidence on the first motion, if Your

1 Honor would like.

2      THE COURT:  Whatever you want to do in the way of

3 presentation.

4      MR. CHINTELLA:  All right.  May I approach Your Honor or hand

5 a document to you?

6      THE COURT:  Just hand them to the clerk.

7      MR. CHINTELLA:  What you're looking at is a filing in this

8 case, it's a single page of ECF Entry Number 20.  What has been

9 highlighted is a statement or an argument made by plaintiff's counsel

10 wherein he states:  "Brett Gibbs is a fairly new attorney.  The

11 undersigned would not assign Brett Gibbs to negotiate a left turn

12 with his vehicle, let alone a settlement on behalf of a client,

13 regardless of whether the case was venued in Georgia, California or

14 Afghanistan.  While Gibbs may be a pleasant young man, to assert that

15 plaintiff's attorney takes orders from Brett Gibbs is absurd and

16 laughable."

17      THE REPORTER:  I'm sorry.  Could you slow down?

18      MR. CHINTELLA:  I'm sorry.

19      THE REPORTER:  It's okay.

20      MR. CHINTELLA:  I would just like to -- what I'm holding in my

21 hand, Your Honor, here are emails from July 18th of 2012 wherein I am

22 negotiating a settlement with opposing counsel and Mr. Gibbs, the

23 same attorney who opposing counsel claims would not -- he would not

24 let him negotiate a left turn, I believe.

25      This type of behavior is typical in these cases, and I have

1   multiple examples of -- I imagine the Court's not interested in all
2   of them, but there are multiple examples where there's deception
3   involved and lying about people's roles and authorities and,
4   essentially, throwing other attorneys under the bus like Mr. Gibbs
5   eventually was by Prenda.  I'd like to hand these to the Court here
6   to look at, if that's alright.

7          What I'm holding here is an email exchange that I obtained
8   permission from my client to disclose.  What this signifies here is
9   that -- if you look on the top portion, the second or the largest
10  paragraph opposing counsel states:  "I'd like to subpoena him," which
11  is Alan Cooper whose signature was alledgedly forged, "and have him
12  state under oath that he has never received a dime from John Steele
13  who has interest in AF."

14         So here we have opposing counsel saying that John Steele has
15  an interest in AF, but they have yet to file a corporate disclosure
16  statement.  Not only that, it conflicts with multiple other accounts:
17  Hansmeier's deposition in California where he states that it's owned
18  by this mysterious trust in Nevis; other filings, which I have with
19  me today, saying it's owned by a company called Livewire Holdings
20  which has an office or an address in the District of Columbia, but
21  it's a post office box and that's the only information we know about
22  it.  I'm not aware of where it's formed or anything else about it,
23  essentially.

24         The bottom portion of the email, it says here by opposing
25  counsel that they are not agreeing to set aside the default, and I

1    have an audio recording of opposing counsel -- that I can let the

2    Court listen to -- saying that they would agree to set aside the

3    default.  It was only after we, basically, would not agree to eat our

4    own attorneys' fees, from my client's perspective, that they were not

5    willing to do that.  Just further evidence of, we believe, bad faith

6    in this case.

7         Now, as far as the first portion of the email where Steele has

8    interest in the plaintiff, defense counsel -- or plaintiff's counsel

9    did an affidavit in one of these California cases, the main one,

10   where sanctions were imposed on Prenda and all the companies.  I'll

11   submit this to the Court, but I'd like to read really quickly a few

12   of the lines of this affidavit.

13        Paragraph 5 says:  "The only person at AF Holdings I've spoken

14   to is Mark Lutz," who's another person that we mentioned in our

15   filings, "who I understand is the CEO of AF Holdings.  I've spoken

16   infrequently to Mr. John Steele over the years.  He has never

17   indicated that he has an ownership interest in any of the clients

18   that I have represented in Georgia, including AF Holdings," which

19   obviously contradicts the email that I received.

20        Then Paragraph 7:  "I have no reason to believe that Mr. John

21   Steele has any ownership interest in clients I have ever

22   represented."

23        Number 8:  "Any statement I may have previously made about

24   John Steele having an interest in AF Holdings was not based on my

25   personal knowledge."  And, of course, we have many, many examples of

```
 1   this type of change in position, some you cannot reconcile, in my
 2   opinion, and some that are very, very hard to reconcile.  I can give
 3   example after example of Prenda coming up with new excuses, like the
 4   metadata in, you know, filings where computers were sold and examples
 5   like that.  I'll submit this to the Court and I'll put the affidavit
 6   on the top, Your Honor.
 7        Another document we'd like to submit is a printout from
 8   Prenda's website listing our client's case here in Georgia, so
 9   there's a connection there, in addition to the email listed on the
10   complaint.  In addition to -- I believe the complaint says -- under
11   plaintiff's counsel's name, it says, "Of counsel to Prenda law."  So
12   that's the structure of this huge organization is that they retain
13   local attorneys and they tell them they're of counsel and they have
14   all the information.  They tell these local attorneys what to do.
15   That's more detailed than I'm looking for right now.
16        This page here is a printout from their website and this is
17   just another example of their, sort of, high-pressure extortionate
18   tactics.  It says here:  "Prior to actually naming and serving
19   individuals accused of various civil and criminal acts against our
20   clients, we attempt to reach out and resolve the issue with the
21   infringer/hacker directly."  So people are publicly shamed on
22   Prenda's website before any sort of resolution of the case.  I'd just
23   like to give you a copy of that, Your Honor.
24        This document, Your Honor, is a document from the Ninth --
25   filed in the Ninth Circuit Court of Appeals by Paul Duffy, and this
```

1  document goes to the point more of they never had any intention of
2  litigating this case.  This document is, basically, an affidavit from
3  Duffy, who is the principal of record, I will say, of Prenda, which
4  is an Illinois -- it's an Illinois company, this law firm that's
5  supposedly orchestrating everything.  Duffy -- I can let the Court
6  read it.  Essentially -- and I have multiple copies.  So I'll just
7  hand the Court here.

8      Here it says on Paragraph 3:  "Prenda is currently winding
9  down its operations and is in the process of dismissing its cases
10  pursuant to the instructions of its clients.  In some instances the
11  requests for dismissals are being opposed resulting in delays and
12  ongoing law and motion proceedings that have precluded Preventa,"
13  excuse me, "Prenda Law from completely ceasing operations.  Prenda
14  law has a negative cash flow that precludes it from collateralizing a
15  second bond."  So there is a sanctions order issued in California.

16      So here Prenda's essentially saying that it has no money.  The
17  operations have moved to this new company called the Anti-Piracy Law
18  Group and there is a pattern over this time period of constantly
19  changing entities and there's no record of the money that's held or
20  anything like that.

21      So even if a sanctions motion were granted -- you know, there
22  have been a few across the country that have been granted.  We're not
23  even sure that they can recover.  This is part of Prenda's business
24  model, essentially.  I don't know how you would recover against a
25  company based in Saint Kitts or Nevis.

1        We're not aware of how much money Prenda -- or plaintiff has.

2   Paul Hansmeier, in the deposition, states that the money is held in

3   these trust accounts for these attorneys across the country, but he

4   doesn't have a figure.  When he talks about -- when asked about, you

5   know, the books of Prenda, the only thing he says is that he looked

6   at a few Excel spreadsheets provided by Mark Lutz, who also happens

7   to be a paralegal at Prenda, who also is the registered agent for

8   Prenda, the agent serves the process of Florida.  And the same for

9   Steele Hansmeier, its predecessor.  He's also shown up in court as a

10  corporate representative for other clients of Prenda.

11       So when going through this case and spending a lot of time on

12  it, it reminded -- this is off topic a little bit, but it reminded me

13  of Bernie Madoff and it reminded me of the Enron and all the shell

14  entities and all the feeder funds and the goal and -- the offshore

15  entities and there's no accountability on the money, plaintiff has

16  not paid taxes or at least that's what they state.  It's unclear who

17  owns plaintiff.  It's this trust, supposedly, formed in Nevis.  It's

18  just further bolstered by the fact that plaintiff is not even willing

19  to file a corporate disclosure statement in accordance with the local

20  rules.

21       The affidavit filed by Lutz in this case, Mark Lutz, is

22  insufficient and doesn't include a date.  There are other examples of

23  that I can give, Your Honor.  In Florida, one did not list the

24  county.  So there was a minor defect in the affidavit which probably

25  renders -- I don't know if it renders it -- it would negate any

1  charge of false swearing, probably.  So maybe that's the purpose, we

2  don't know.  Mark Lutz has never testified, never been brought to

3  court.  All these cases are dismissed before they get to that stage,

4  if a settlement isn't reached.

5       The rub of these cases are that defendants are -- invariably,

6  if they want to fight, forced to pay equal or greater amount in

7  attorneys' fees than it would cost to settle.  And we argue that

8  that, along with Prenda's history as far as never going past

9  discovery, never, you know, investigating, amounts to bad faith.

10      Also the Duffy affidavit here, we would argue that if -- Duffy

11 says they're winding down operations now.  If this case had gone

12 forward normally, it probably still would not be over.  So in a

13 sense, Duffy is saying here that by this point in time we were

14 planning on winding down Prenda and dismissing our cases.  So,

15 really, they never had any intention of litigating it.

16      By this time they're moving over to the Anti-Piracy Law Group,

17 which was formed in November of last year, six days after this case

18 was filed.  They were already planning at that point in time to move

19 over to that new entity, just like all the -- you know, Steele

20 Hansmeier gave way to Prenda and Prenda's giving way to the

21 Anti-Piracy Law Group.  Duffy is the principal of Prenda, he's also

22 the principal of Anti-Piracy Law Group.  Steele has connections with

23 all of those, Your Honor.

24      So that's sort of a quick overview.  If there's any specific

25 point in there where the Court would like more examples of evidence,

1  then we would be more than happy to provide it.  We would argue that

2  for --

3          THE COURT:  It is alleged, is it not, that Heartbreaker

4  Digital, LLC was the holder of the copyright?

5          MR. CHINTELLA:  Yes.  They're listed on the copyright

6  registration with the Copyright Office right now, Your Honor.

7          THE COURT:  Have you obtained any evidence or tried to obtain

8  any evidence as to who the principals of that corporation are?

9          MR. CHINTELLA:  I can pull it up on my computer, Your Honor,

10 if you'd like.  I believe it is the person whose signature --

11 purported signature appears on the copyright assignment, which his

12 name escapes me right off the top of my head.  I can pull it up.

13         THE COURT:  All right.  All right.  That was an assignment to

14 Raymond Rogers?

15         MR. CHINTELLA:  That is correct, Your Honor.

16         THE COURT:  And that is an assignment to --

17         MR. CHINTELLA:  The assignee is plaintiff and Alan Cooper is

18 signing on behalf of the assignee, that signature is clearly forged.

19 When asked about the forgery -- or to give evidence on the forgery,

20 John Steele in California pled the Fifth Amendment.

21         THE COURT:  Well, you keep talking about in California and

22 elsewhere.  What have you got in the way of evidence in this court?

23 Have you brought an affidavit in or any sort of evidence?  Do you

24 have an affidavit from a couple that you filed in this court?

25         MR. CHINTELLA:  Yes, Your Honor.  We submitted -- requested

 1  judicial notice of the hearings in California where Alan Cooper
 2  himself testifies that his signature is forged.  But we're unable --
 3  we would request we could -- we would be happy to request discovery
 4  in this case to get that evidence.  But the reason we don't have it
 5  is because plaintiff will dismiss these cases, invariably, whenever
 6  they run that risk of that evidence being disclosed.  So we're unable
 7  to get it, but we would be more than happy to -- I'd be more than
 8  happy to write a motion to request discovery, depositions,
 9  interrogatories to a limited extent or whatnot to get the
10  information.

11        But we're unable to get it, basically, because the plaintiff
12  dismisses these cases in this fashion.  I'm not aware of any other
13  discovery advice -- or, excuse me, device other than the Open Records
14  Act.

15        THE COURT:  What are you seeking in the way of damages?

16        MR. CHINTELLA:  Attorney's fees, Your Honor.  I've spent
17  hundreds of hours on this case, but I would only ask for attorney's
18  fees in the amount that I charge my client -- and expenses.

19        Personally, I'd like to be done with the case so I'm not going
20  to sit here and try to gain 10s of thousands of dollars in attorney's
21  fees, and I don't think that would be likely anyhow.  Basically I
22  would like to recoup the money for my client and any expenses that he
23  has incurred, including any expenses the expert witness has incurred
24  as well.

25        THE COURT:  Well, I'll let you come back and respond later.

1   Let me hear from the other side.

2           MR. CHINTELLA:  Thank you, Your Honor.

3           MR. NAZAIRE:  May I step up, Your Honor?

4           THE COURT:  Yes.

5           MR. NAZAIRE:  Good morning, Your Honor.

6           I'd like to address the three motions that we discussed.  ECF

7   Filing Number 16 was the motion by the defendant, Your Honor, for

8   alleging a vexatious litigation.

9           Your Honor, as far as this case goes, the definition of --

10  which I'm sure you know -- of vexatious litigation basically is when

11  you file a lawsuit with the knowledge that it has no legal basis by

12  the purpose of bother, annoy or harass somebody.

13          It is my client's position, Your Honor, AF Holdings, that when

14  we filed this complaint there was no intention, Your Honor, of

15  harassing Mr. Patel.  AF Holdings, from what I understand -- I don't

16  have the extensive knowledge of the million other cases that are

17  related as Mr. Chintella does.  But from my understanding, Your

18  Honor, when I am handling the case with a client, it was not my

19  intention to harass Mr. Patel.  It was not my client's intention to

20  harass Mr. Patel.  Therefore, Your Honor, there is no vexatious

21  litigation involved here.

22          Therefore, I filed -- and that was Number 16, Your Honor.

23  Therefore, I filed Motion Number 20 which I filed a cross motion,

24  both in order to answer to Motion Number 16 and in order to ask for

25  sanctions, nothing major, against the defendant -- the defense, for

```
 1  bringing a vexation lawsuit without any real purpose.

 2        Because from what I understand -- I spoke to other attorneys,

 3  I've read up on it.  For example, in a vexatious lawsuit, you have to

 4  meet a pretty high standard.  Basically, for the defendant just to

 5  say "I didn't do it," doesn't mean that the plaintiff has initiated

 6  vexatious litigation or commencing an action in vexation, Your Honor,

 7  and that's why I filed Cross Motion Number 21.

 8        As far as the other motion, which is Motion Number 30, I

 9  believe.  Basically, Your Honor, it's pretty much what you've been

10  discussing, I guess, with defendant.  He filed a motion regarding a

11  California case and, basically, all my motion said, Your Honor, was

12  that -- I opposed him filing the motion because I thought it was just

13  creating more billing, Your Honor, to file this document in the

14  California case and we're in a Georgia case.  And, second, it was

15  trying to tell the Court -- and I use the word mending, maybe it

16  wasn't mending, but it was trying to tell the Court, listen,

17  California has assessed $81,000 against -- it's another case, Your

18  Honor.  I forgot the name.

19        MR. CHINTELLA:  Ingenuity13.  It's a consolidated case.

20        MR. NAZAIRE:  Ingenuity13, Your Honor, versus another

21  defendant.  And, therefore, my argument was Rajesh Patel is the

22  defendant who supposedly we've annoyed or harassed, and I didn't see

23  any reason why they had filed that paper, and that's why I made the

24  motion, Your Honor.

25        If there's any questions, I will answer it, Your Honor.
```

1          THE COURT:  Well, yes, I have a lot of questions.

2          MR. NAZAIRE:  Yes, Your Honor.

3          THE COURT:  First, he alleges, in effect, if you read into it,

4     that your lawsuit is essentially a fraudulent lawsuit.  What did you

5     do to determine the validity of that lawsuit?

6          MR. NAZAIRE:  Basically, Your Honor, at the beginning of the

7     lawsuit what I did was I -- I didn't have any evidence on me.

8     Basically what I do is I call -- I believe I spoke with Mr. Mark Lutz

9     and Brett Gibbs.  What I do is I call them and basically --

10          THE COURT:  Lutz and who?

11          MR. NAZAIRE:  Mark Lutz and -- Brett Gibbs is an attorney.

12     He's, from what they said, the lead attorney for Prenda Law.

13     Basically Prenda Law is a national law firm.  They were the ones who

14     referred this case to me -- this case to me, and he would be the

15     contact person to ask about getting documentations.

16          Basically what I did was I called them, I asked whether it was

17     true, whether they had witnesses that could testify.  Basically what

18     I was told is that -- what I was told is that the defendant who used

19     IP address 75.89.36.80, that was the -- that they had a forensic firm

20     that determined that that IP address had downloaded BitTorrent files

21     and that when they traced that IP address they found out that it was

22     a Windstream, which is the company that issued that address.  I'm not

23     sure exactly how they were able to force Windstream to give them the

24     name, whether it was some other case.  But basically, from what I

25     understand, Windstream told them that was Mr. Rajesh Patel.

1        Your Honor, there was no discovery -- basically, Your Honor,

2   the way it works is I confer with the client.  I asked him if the

3   case is true.  I look up the law to see if there's a basis for suing

4   him -- suing any client, him or her, and I begin the lawsuit.  No,

5   Your Honor, I did not have a handful of -- you know, a closetful of

6   evidence.

7        And basically, Your Honor, when we sue somebody -- basically

8   when I sue somebody, I make the allegation, they come back -- they

9   normally come back and then we have discovery, and that's how we find

10  out -- for example, Mr. Patel, after the fact, he said that he had a

11  gas station and he had two computers and that he had different

12  employees that worked there and that anybody could have used his

13  computers.

14       Had Mr. Patel answered, Your Honor, which he defaulted on --

15  had he answered, we could have had discovery, we could have found out

16  who the employees that worked for him, and we could have had them

17  say, listen, it was either us who did it or it was either somebody

18  else.  But the reason --

19       I believe the defense here says that, well, there hasn't been

20  any discovery.  Well, I don't believe there should be discovery at

21  this point, Your Honor.  The defendant defaulted.  He admitted -- he

22  submitted an affidavit, Your Honor, where he admitted that he got the

23  paper from his mother, his mother handed him the summons, the

24  complaint, and he just put it aside and then he waited until after

25  the fact to answer.  Had he answered, Your Honor, we could have had

```
 1   discovery, they could have told us it was not Mr. Patel, and this
 2   case could have ended without us having to dismiss it with --
 3            THE COURT:  You never tried to take his deposition, even
 4   though he was in default, to find out the source of what he said?
 5            MR. NAZAIRE:  No, no, Your Honor.  We never took a deposition
 6   because he was in default, Your Honor.  Maybe that's a wise thing to
 7   do in the future, if there's such a case.  But normally, no, if I get
 8   a default against somebody, Your Honor, there's no -- normally if
 9   they haven't answered --
10            THE COURT:  Have you ever asked anybody that you were dealing
11   with how many times that particular web -- what is it -- whatever you
12   call it, a website, whatever -- that site, that number had downloaded
13   anything from this?
14            MR. NAZAIRE:  No, Your Honor.  In retrospect, I should have,
15   if the allegations are correct.  Normally, no, I did not -- I did not
16   ask them, Your Honor.  It's presumed by me that that would be the one
17   time.
18            THE COURT:  Did you ever ask them if they had any information
19   that that website was in any way distributing or further using
20   anything from the alleged copyrighted product?
21            MR. NAZAIRE:  I'm sorry, Your Honor.  Can you repeat that?  I
22   apologize.
23            THE COURT:  Did you ask them if they had any evidence of its
24   having been used in any way?
25            MR. NAZAIRE:  Yes, I did.  And they said they did have
```

1  evidence, Your Honor.

2      THE COURT:  They did have it.  Well, did you ask what the

3  evidence was?

4      MR. NAZAIRE:  Well, basically, a company they use -- I believe

5  I wrote it down -- 6881 Forensics and basically -- yeah, basically

6  they keep -- they keep all the information and when we need it they

7  send it to us.

8      THE COURT:  Well, what did they send you?

9      MR. NAZAIRE:  No, they did not send me anything, Your Honor.

10     THE COURT:  You didn't ask them for anything?

11     MR. NAZAIRE:  Yes, I did, Your Honor, and they said they would

12 send it.

13     THE COURT:  Was this before you filed the lawsuit?

14     MR. NAZAIRE:  Yes, it is, Your Honor.

15     THE COURT:  And you went ahead and filed the lawsuit even

16 though you'd requested something they hadn't sent to you?

17     MR. NAZAIRE:  Yes, Your Honor.  If you will excuse me, Your

18 Honor, I don't mean to cut you off.  Do you have another question

19 because I can explain?

20     THE COURT:  Beg your pardon?

21     MR. NAZAIRE:  I can explain, Your Honor.

22     Basically this is akin to -- I guess, Your Honor, let's say

23 somebody's suing somebody for a credit card case.  Normally in these

24 cases, you know, the credit card company would send the billing

25 statement and the assignment and everything else, they would send it

1  afterwards.

2       Same thing with, say, a personal injury suit, Your Honor.

3  Maybe you'd get a doctor's report at first, but then the diagnostic

4  test, everything else would come afterwards.  Your Honor, it's not in

5  every lawsuit where somebody has all of the evidence before they file

6  the lawsuit, Your Honor.  It's just it was reasonably expected that

7  they would have the evidence and -- it was reasonably expected, Your

8  Honor.  No, I did not have that evidence.

9       THE COURT:  How many lawsuits have you filed in behalf of this

10  or these plaintiffs?

11       MR. NAZAIRE:  In AF Holdings it's -- Your Honor, I believe

12  it's approximately ten.  I'm sorry, I left the book.  I had a book

13  with the amounts.

14       THE COURT:  Did you ever have discovery in any of them?

15       MR. NAZAIRE:  No, Your Honor, they never got to that point.

16       THE COURT:  Were they all dismissed without answers being

17  filed?

18       MR. NAZAIRE:  No, Your Honor.  There were answers filed in

19  some of them.

20       THE COURT:  At what point after answer was filed were they

21  dismissed?

22       MR. NAZAIRE:  I apologize, Your Honor.  I'd have to find it.

23  But there were some.

24       THE COURT:  If there were ten, how many were filed before this

25  one?  Was this the last one?

1    MR. NAZAIRE:  I believe this -- yeah, this one, I believe, I

2  wrote -- this one was filed in either November and December.  This

3  was one of the last ones we filed, Your Honor.

4    THE COURT:  So there would have been eight or nine ahead of

5  it?

6    MR. NAZAIRE.  Yes.  They were all -- I'm just trying -- I'm

7  sorry, Your Honor.  We did settle a few, I'm just trying to remember

8  if they were settled before the answer was filed or if they weren't.

9  But I do know -- I do -- from what I understand, I might have settled

10 one or two, but they all have been dismissed.

11   THE COURT:  Other than this case, did any of the others ever

12 have an attorney involved in them?

13   MR. NAZAIRE:  I'm sorry, Your Honor.

14   Did we have an AF Holdings case together?

15   MR. CHINTELLA:  I'm sorry?

16   MR. NAZAIRE:  Did we have an AF Holdings case together?

17   MR. CHINTELLA:  Do you mean ever before this time?

18   MR. NAZAIRE:  You and me.

19   MR. CHINTELLA:  We have had one in State court, yeah.

20   MR. NAZAIRE:  Okay.  Your Honor, there has been at least one

21 where Mr. Chintella was on, Your Honor.

22   THE COURT:  That was in State court, according to what I heard

23 him --

24   MR. NAZAIRE:  Yes, Your Honor.

25   MR. CHINTELLA:  And that one settled, Your Honor.

```
1          MR. NAZAIRE:  That one settled, Your Honor, if you heard him.

2          THE COURT:  But all of the others settled before the

3  defendants hired an attorney?

4          MR. NAZAIRE:  Most of them, Your Honor, were dismissed without

5  being settled.

6          THE COURT:  And is that -- and why was that?

7          MR. NAZAIRE:  Okay, Your Honor, let me explain.

8          I was asked to review the complaint, to draft the summons

9  myself, and to -- if you could bear with me, Your Honor -- and to

10 file these lawsuits.  I did that.  I reviewed the complaint, I went

11 over it with either Mr. Gibbs or Mr. Lutz, and I filed a lot of these

12 cases.  They were all filed pretty much around the same time.

13         And then one day, Your Honor, I get a call from -- not a call.

14 Somebody from Prenda Law, I believe it was Ms. Dugas, she asked me if

15 I had served the defendants in this case, and I told her, no, I did

16 not serve it.  I said it is the job -- it's your job to pay for the

17 process server.  I don't want to pay for a process server.

18         And then approximately -- after that, Your Honor, they asked

19 me -- yeah, I believe the AF Holdings cases -- yeah, I spoke with

20 either Mr. Gibbs or Mr. Lutz and I was asked to dismiss those cases,

21 Your Honor.  I presumed the reason I was asked to dismiss it was

22 because they had felt -- I thought I probably did something wrong.

23 But I thought it was because they had failed to serve them.  From

24 what I understand, a lot of those lawsuits were not even served.  So

25 I thought that it was, maybe, something wrong I did on my part and
```

1    they were upset and they probably didn't want to work with me

2    anymore.  So that's why a lot of those cases were dismissed, Your

3    Honor.

4           THE COURT:  How many settlements did you receive?

5           MR. NAZAIRE:  From AF Holdings cases?

6           And one thing I want to apologize, Your Honor, for not

7    bringing my book.  I did have a black book that has exactly the

8    settlements and how much they were.  I would say no more than five,

9    Your Honor.

10          THE COURT:  Did you have a -- did you in any way communicate,

11   write a letter to the defendants or how did -- you didn't have a

12   process server, I gather?

13          MR. NAZAIRE:  No, Your Honor.

14          THE COURT:  Did you mail the people a copy of the complaint

15   and ask them to respond?

16          MR. NAZAIRE:  No, Your Honor.  I have never -- I make it a

17   habit, Your Honor, never to write letters to defendants because --

18          Just as a background, I used to do FDCPA work and I've seen

19   defendants complain that people write them letters that they're not

20   supposed to.  So my practice, Your Honor, is never to write any

21   letters to any defendants.  I just keep things mainly in litigation.

22   I do write letters to defense attorneys or to, perhaps, an insurance

23   company, but I never write any letters to any individual defendants,

24   Your Honor.

25          THE COURT:  Well, if you didn't have attorneys in the cases

1    and you settled with some of these defendants, how did you deal with

2    settling with them or making a demand on them if you weren't writing

3    them a letter?  Did you make a phone call?

4         MR. NAZAIRE:  Your Honor, basically, from what I remember,

5    there were one or two who were served with the complaint, with the

6    summons, and they would call -- and they would call and ask to settle

7    and then there were others who -- that were involved with what's

8    called John Doe cases where basically their company, let's say -- not

9    Windstream, I don't think Windstream ever called defendants.  But

10   let's say Comcast, Your Honor.  What Comcast does is if it gets a

11   subpoena it will call the defendant and say "Listen, we have a

12   subpoena that says that you own this IP address" -- that they're

13   looking for IP address, you know, 00 whatever.  "We want to let you

14   know that we have to comply with the subpoena and we have to give

15   your name."

16        So what the defendants would do in those cases is they would

17   call -- they would call - they would call and -- yeah, they would

18   call either -- they would call me and/or either somebody from Prenda

19   Law and they would say "We want to settle," basically that's how the

20   settlements were, Your Honor, without the attorneys, if that answers

21   your question.  But, once again, Your Honor, it wasn't that many

22   cases.

23        THE COURT:  Did you have all of the dealings with the

24   defendants or did someone else have dealings with them?

25        MR. NAZAIRE:  Your Honor, I had -- with some defendants I had

1    the dealings and with other defendants I believe it was Mr. Lutz,

2    Your Honor.

3            THE COURT:  And he was with Prenda?

4            MR. NAZAIRE:  Well, it's alleged, Your Honor -- once again, I

5    don't want to make any statements that seem untrue.  It's alleged

6    that he's a paralegal for Prenda also.  I'm not sure if that's true.

7    But he works in an office -- I'm not sure exactly where he works, but

8    basically he's the representative for AF Holdings.  So as a

9    representative for them, he's settled a few cases, I believe.

10           THE COURT:  Well, how did he get involved -- how did anybody

11   know to contact him if you had not told them to contact him?

12           MR. NAZAIRE:  They searched down -- on some of the pleadings,

13   Your Honor -- just to get back on that old email address.  In the

14   beginning I was told that it's safer to put the We Fight Piracy

15   website.  Once again, it's not letters.  I did not send any letters,

16   just to make that clear.  Anything that a defendant has regarding me

17   would be my summons.  In the beginning I had put down a We Fight

18   Piracy email and that's how they were -- from what I understand, they

19   contacted Prenda Law is through that email.  But it was not through

20   any letters I sent, Your Honor.

21           THE COURT:  The complaint itself, then, had some email address

22   and the defendants were notified in it that they could make contact

23   through that email address?

24           MR. NAZAIRE:  In this one, yes, Your Honor.  Yes.

25           THE COURT:  Was that true in this case?

```
 1          MR. NAZAIRE:  Well, it's on the pleading.  It was -- it's
 2    presumed, yes, if it's on the pleading, that they can contact that
 3    email address, Your Honor.  I don't have the complaint in front of
 4    me, but I believe when Mr. Chintella was talking --
 5          Do you know if this one has a regular email on the form?
 6          Because, Your Honor, what happened is after awhile I started
 7    taking that email address off and I started putting my email address,
 8    which is Nazaire.Jacques@gmail.  So I don't have the complaint in
 9    this one in front of me, but this one might have been one that had
10    the email address of We Fight Piracy.  Yes, Your Honor.
11          THE COURT:  All right.  You're just showing me a signature
12    element.  What is that from?  This is addressed to Mr. Chintella.
13    You're the one operating the computer.
14          MR. CHINTELLA:  Yes, sir.  That is the end -- oh, I didn't
15    know you were really looking at it.  I've never used this.
16          That is the last page of the complaint.
17          THE COURT:  Not in this case.
18          MR. CHINTELLA:  Yes, it is, Your Honor.  It's Page --
19          THE COURT:  Oh, okay.  I had missed that, alright.  I
20    apologize.  I was looking at the signature element on the next page.
21          MR. CHINTELLA:  Yes, sir.  All these complaints are cookie
22    cutter, Your Honor, they're almost verbatim except for the -- sorry.
23          THE COURT:  All right.  What else do you want to say in
24    regard to --
25          MR. NAZAIRE:  Your Honor, yeah, as far as the email address --
```

```
 1   basically, as I was explaining to you, I was told in the beginning
 2   not to put my email address on because there are certain
 3   organizations -- and I'm not sure if this is relevant, but just to
 4   answer your question, and I'll be quick.
 5        There are certain organizations like diecopyrighttroll.com,
 6   dietrolldie.com, techzer.com.  What they do is they harass attorneys
 7   who represent copyright plaintiffs and they -- and I was told that I
 8   was going to be harassed if I put my email address there, that's why
 9   in the beginning I put that address there and then I figure -- and
10   then I believe Mr. Chintella had made a complaint to me saying "Well,
11   you have Gibbs' address on it."
12        So then afterwards, I said, "Okay, fine."  I put my own email
13   address on it.  And I have gotten an email being bothered from that,
14   but I suppose it's not that big of a deal.  So that's why anything I
15   have, I just now keep my personal email address on it, Your Honor.
16   That's basically it, Your Honor.
17        THE COURT:  That is your address in Kennesaw?
18        MR. NAZAIRE:  Yes, it is, Your Honor.  125 Town Park.
19        THE COURT:  And that's your phone number?
20        MR. NAZAIRE:  On this one, no, Your Honor, that's the phone
21   number to Prenda.  And like I said, it was probably a mistake keeping
22   it there, but from then on I just -- all the other pleadings you see,
23   Your Honor, has my phone number.  I apologize, Your Honor.
24        THE COURT:  Does the local rule require a phone number on the
25   complaint, Mr. Stanhope?
```

1        THE CLERK:  I'm sorry, Judge?

2        THE COURT:  Does the local rule require -- have you got a copy

3   of the local rule?

4        THE CLERK:  Let me look it up.

5        THE COURT:  You never filed a statement of interested parties

6   in this case; is that correct?

7        MR. NAZAIRE:  Your Honor, I did file -- from what I

8   remember -- the thing is I have to go back on Pacer.  From what I

9   remember, I did file a corporate disclosure statement, Your Honor.

10       THE COURT:  You did?

11       MR. NAZAIRE:  Yes, I did, from what I recollect.  I don't want

12   to lie to the Court, but from what I recollect.  I believe what

13   Mr. Chintella had told me was that he wasn't satisfied with the one I

14   did file.

15       Is that your recollection?

16       THE COURT:  It's Docket Item Number 4 is a corporate

17   disclosure.

18       MR. NAZAIRE:  Yes, yes.  There you go, Your Honor.  Thank you.

19       By the way, Your Honor -- can I just say one more thing?

20       THE COURT:  While the clerk's -- yes, go ahead.

21       MR. NAZAIRE:  From what I remember from the local rules, they

22   do say you have to have your phone number, your fax, and your email.

23   But basically from what I interpreted is that as long as the phone

24   number where I can be reached -- where somebody can get in contact

25   with me, as long as I have a phone number there, that will be fine,

1   Your Honor.  It doesn't have to be my personal cellphone or directly

2   linked to my office, which you may disagree, Your Honor, but that was

3   my interpretation.

4           THE COURT:  I have some disagreement as to whether or not --

5   Prenda is another group of lawyers, you're not a member of Prenda?

6           MR. NAZAIRE:  Absolutely not, Your Honor.  They referred cases

7   for me to file, but I am not a member of Prenda.

8           THE COURT:  I have some concern as to whether they can appear

9   in this Court and whether or not their appearance, if they made it --

10  the question is you made it, probably.  If they made it, by our rules

11  that constitutes a contempt of Court.

12          MR. NAZAIRE:  If they made what, Your Honor?

13          THE COURT:  If they made an appearance without being admitted

14  to practice in this Court.

15          MR. NAZAIRE:  From what I understand, they have not made an

16  appearance, Your Honor.

17          THE COURT:  Their name's on that complaint.  Prenda Law,

18  whatever that is, sounds like a -- is there a Mr. Prenda?

19          MR. NAZAIRE:  Your Honor, from the documents I've seen, Paul

20  Duffy, Your Honor, is the sole owner of Prenda Law.  There is no Mr.

21  Prenda that I know of, Your Honor.

22          THE COURT:  Well, we don't practice through corporations.

23          MR. NAZAIRE:  I understand, Your Honor.  But to answer your

24  question, Paul Duffy's the --

25          THE COURT:  Well, there's a lot of things in this case that

 1   bother me.  It seems that -- and I've been waiting and coming to it

 2   the last.  I've been wanting you to address the merits as they relate

 3   to the complaint and the motion first and then we're going to get

 4   into the personal matters.

 5          MR. NAZAIRE:  Yes, Your Honor.

 6          THE COURT:  Because what I've seen and read in this case is

 7   absolutely despicable and no lawyer should do some of the things that

 8   have been done.

 9          I can't read it that far away.

10          THE CLERK:  Judge, Local Rule 11.1 in regards to counsel

11   identification states -- the rule states "Counsel's name, complete

12   address, including post office box or drawer number, and street

13   address, telephone number, facsimile number, and Georgia Bar number

14   shall appear on every pleading and other paper presented for filing."

15          THE COURT:  What does it say about -- does it say anything

16   about email address?

17          THE CLERK:  It does not.

18          THE COURT:  That's not required.  But it does say phone

19   number?

20          THE CLERK:  Yes, sir.

21          THE COURT:  Well, those are things that just -- you know, one

22   of them might be excused, but there's so many items that skirt the

23   rules or run in the face of the rules that it bothers me.

24          Now, the next item in which I was just addressing -- and I've

25   tried to keep the two separate.  I've tried to get my law clerks --

1   because we've got, what, a foot -- we've got two notebooks full of

2   documents, nearly a foot of documents, printouts in this thing.  But

3   I've tried to get them just to separate as to both of you, the claims

4   that go to the lawsuit itself -- that is, the complaint and/or the

5   motions -- as opposed to the accusations and allegations that are

6   personal.  This sounds like a petty, personal fight between lawyers

7   in a -- well, in an arena where they have different philosophical

8   views, apparently.

9        What relevance does alleging that a person has a DUI or some

10  other criminal conduct have to do with these motions?

11       MR. NAZAIRE:  Your Honor, in retrospect, it has very little

12  relevance but the reason --

13       THE COURT:  Very little.  Tell me what the "little" is.

14       MR. NAZAIRE:  Your Honor, when I read the motion, Your Honor,

15  Number 16, I noticed that there's a John Steele -- that Mr. John

16  Steele was mentioned in a lot of the pages and that it was -- that it

17  was just creating a lot of confusion.

18       So I did speak with Mr. John Steele and I asked him -- you

19  know, if he knew Mr. Chintella, if he had any -- why would he mention

20  him in this case and confuse all these things and basically what he

21  told me was -- he told me that he has dealt with Mr. Chintella

22  before.  And I believe Mr. Chintella had filed an affidavit in a

23  different case, which I know we're not here, stating that he did know

24  Mr. Steele.  Mr. Steele alleged to me -- and I'm not sure if it's

25  true -- it's because Mr. Chintella thought that he had -- that he had

1    put his name out into a website alleging that he has DUIs, and that's

2    what Mr. Steele told me.

3        So I just want to relay that to the Court so they could

4    understand that there was something personal by the defense as to

5    this case, and that's why I put that, Your Honor.  In retrospect, it

6    was wrong to do it and I apologize, Your Honor.  But that's the

7    reason.

8        THE COURT:  Well, I'm not sure about these allegations a

9    moment ago and which side they were coming from where it's alleged

10   that he's a terrorist.

11       MR. NAZAIRE:  No, Your Honor, I have never alleged that --

12       THE COURT:  What was it?

13       MR. NAZAIRE:  Excuse me?

14       THE COURT:  What was alleged?

15       MR. NAZAIRE:  Your Honor, I had said that the Electronic

16   Frontier Foundation, they have some of the same beliefs that other

17   groups that -- for example, Senator McCain has said in the news that

18   WikiLeaks should be put on terrorist group, that it's a terrorist

19   organization and basically companies -- what I was trying to say,

20   Your Honor, is companies like WikiLeaks, they have the same beliefs

21   that people should go into peoples' computers, hack them, enter

22   people's email.  For example, that guy in the news, Snowden, does.

23       I believe that if people hack into other people's computers

24   that that's some sort of terrorism, but in no way did I ever say that

25   the defense attorney -- the defense attorney in this case, Your

```
 1  Honor, is a terrorist.  I was talking about the Electronic Frontier
 2  Foundation, that they have some of the same goals.  Not that they
 3  have terroristic goals, but their goal is to not have anybody who's a
 4  hacker prosecuted.  And these terrorist organizations have those
 5  goals as well, but there's different reasons they have it.  I believe
 6  that some of these organizations --
 7          THE COURT:  You're confirming to me that there's some
 8  philosophical views in this arena that are different as to the two of
 9  you.
10          MR. NAZAIRE:  Yes, Your Honor.
11          THE COURT:  Maybe he thinks you're a terrorist.
12          MR. NAZAIRE:  I don't believe he thinks that.  Nor do I
13  believe he's a terrorist, Your Honor.
14          THE COURT:  All right.  There's another one that was very
15  disturbing to me.  You made some -- you had some very inappropriate
16  and unprofessional things to say about California and California
17  courts.
18          MR. NAZAIRE:  Your Honor, I start out the thing, Your Honor,
19  by saying that I respect the decision and basically -- Your Honor,
20  it's -- Your Honor, I understand what you're saying, Your Honor.
21          I went -- I Googled my name and everything says "Nazaire says
22  that California has gay marriage; therefore, Georgia should rule
23  against" -- "should rule in his favor," which is not what I said,
24  Your Honor.
25          What I said was that going back to Motion Number -- I believe
```

```
 1   it was Motion Number 30, my defense of that is that that order is not
 2   a mandate and I was just -- those are hot-button issues, Your Honor.
 3   I was just making a comparison.  I said, "Listen, if California has
 4   gay marriage, is Georgia all of a sudden going to have gay marriage?
 5   If California has some immigration law, is Georgia going to have
 6   one?"  What I was arguing was that there's a different standard that
 7   applies to California that doesn't apply to Georgia, Your Honor.
 8        Your Honor, I don't believe I ever said anything horrible
 9   about California.  I don't hate California.  It's my opinion I have
10   never said anything.  I was just making a comparison.  I never said--
11        THE COURT:  You can have whatever views you want about
12   California.  I'm not affecting your views.  If you don't like
13   California, that's your business.  There are probably a lot of people
14   who don't.  But it's the manner of expressing them in these pleadings
15   against this lawyer and the things you had to say that were very
16   inappropriate in this lawsuit.
17        MR. NAZAIRE:  Your Honor, if it was inappropriate, I
18   apologize, but I did not mean to say anything bad against any --
19   California or any suit.  Your Honor, I made it clear that I respected
20   that judgment, that decision.
21        THE COURT:  My law clerk calls to my attention that Rule 11
22   covers the issue we were addressing a moment ago about the phone
23   number on the pleadings.  She also points out that the current
24   rule --
25        Local rule, you mean?  The current Rule 11?
```

1       LAW CLERK:  Uh-huh.

2       THE COURT:  Current Rule 11 also requires the email and it's

3   misleading to give someone else's and we don't even know who -- we

4   don't know who that is.  You tell us it's somebody at Prenda or

5   somebody at some other cause-motivated group.  You repeated the name

6   a while ago and I don't remember what it was.  All right.

7       MR. NAZAIRE:  Your Honor, can I say one more thing?

8       THE COURT:  Yes.

9       MR. NAZAIRE:  Your Honor, there was a copy of a motion that

10  was filed in this case that was filed by California lawyers in a

11  California court and was a very horrible -- it said very horrible

12  things, and I just want to make sure the Court doesn't confuse that

13  with what I filed.  I was not the one that filed -- it was regarding

14  a Motion to Recuse, I'm not the one who filed that.  It was inserted

15  into the pleadings -- into the docket by the defendants and I just

16  want to make sure --

17      THE COURT:  Well, that was equally as inappropriate.

18      MR. NAZAIRE:  Okay.  Well, I just want to make sure the Court

19  realizes I was not the one that did that, Your Honor, and that's all

20  I have to say, Your Honor, for now.

21      THE COURT:  Now, what is relief in your motion?  Tell me again

22  what it actually is that you're seeking -- your motion asked for and

23  what you're seeking.

24      MR. NAZAIRE:  Your Honor, basically the motion said that --

25  there were a lot of documents as the defendant started that had

1   nothing to do with this case, that were related to other cases.  It

2   was a lot of documents that I had to read, a lot of unnecessary

3   documents, and what I had asked for was $200 per document.  But, Your

4   Honor, in my motion, the truth is -- in my cross motion, basically

5   all I'm asking for is $1 just to teach the defendants a lesson that

6   they're not supposed to allege a vexatious lawsuit when this was not.

7   This was done in good faith.

8          I have nothing, once again, personal against Mr. Patel and AF

9   Holdings does not either, Your Honor; therefore, my cross motion was

10  to punish them for filing that motion which is -- which that one was

11  not filed in good faith and that one was based on, perhaps,

12  philosophy as well, their philosophy.  It's $1 I'm asking in that

13  cross motion, Your Honor.

14         Your Honor, can I make one more statement?

15         THE COURT:  Yes, sir.

16         MR. NAZAIRE:  Your Honor, I believe -- and maybe the Court may

17  disagree.  I believe it is unprofessional for anyone -- if I send an

18  email, for somebody to file that email, which I did not expect them

19  to.  An email is not an affidavit, it's not a court document.  I see

20  that there have been emails about what I -- you know, things that I

21  say off-the-cuff.  They're not made to be testimony, these emails.

22         For example, the email that was presented earlier, which is

23  Tuesday, March 5th, I would just ask that the Court make a statement

24  regarding that email, whether that's professional for the defense to

25  file an email where I had no -- where I did not know that they would

1    be filing it at the time that it was originally filed.

2         Also, Your Honor, I believe that attorneys -- when attorneys

3    speak with each other over a telephone, that the other attorney

4    should tell the attorney he's speaking with, or anybody he's speaking

5    with, that "Hey, this phone call may be recorded."  In most companies

6    you call, Your Honor, there's normally a prompt that says "These

7    phone calls may be recorded."

8         I did not know that Mr. Chintella was recording me at the time

9    that he states he was recording me.  I would point that sometimes I

10   travel to New York, Your Honor, and from what I remember the law

11   is -- I may be wrong -- that it is illegal for attorneys to

12   tape-record interstate phone calls.

13        Therefore, I would just -- I would just, kind of, make a

14   statement that in the future that, just to let the defense know as a

15   warning, that I may be traveling and if they record my telephone

16   calls without permission, that it may be a violation of the law.  And

17   that's all I have to say, Your Honor.  I don't know what's your

18   opinion as to attorneys tape-recording other attorneys secretly.

19        THE COURT:  Are you seeking something here in that regard?

20        MR. NAZAIRE:  No.  I just want to give warning to the

21   defendants not to do that in the future.  I am seeking nothing else,

22   Your Honor.  I was just trying to get out of this case.

23        This case, from my perspective, has gone long enough and it

24   deals, really, with other cases and it doesn't deal -- you know, a

25   lot of the things that were mentioned mention a lot of other cases.

1   Some of the pleadings mention an ethics violation that was alleged

2   from two people who have nothing to do with this -- who have either

3   nothing or little to do with this case.  For example, Graham Seifert

4   was an attorney in Florida who made an ethical complaint, and Graham

5   Seifert is not mentioned in this case, not by me at all.

6           THE COURT:  All right.  I'm going to go back now, getting away

7   from the personal attacks and going back to the basic complaint.  As

8   I say, these are two separate areas.

9           MR. NAZAIRE:  Yes, Your Honor.

10          THE COURT:  And I have great problems with both areas.

11          You purported to represent AF Holdings and you filed, I

12  believe you said, at least ten cases for them and according to -- a

13  lot of those may have been in courts other than the Northern District

14  of Georgia.  You indicated there was at least one in a State court

15  apparently.

16          MR. NAZAIRE:  Yes.  And a few in the Middle.  I believe there

17  were a few in the Middle.

18          THE COURT:  Some in the Middle District?

19          MR. NAZAIRE:  Yes, Your Honor.

20          THE COURT:  There were at least four in this district and

21  three of those -- two or three of those were mine in this division.

22          MR. NAZAIRE:  Yes, Your Honor.

23          THE COURT:  I want to ask again.  Who, as an officer or

24  employee of AF Holdings, LLC, did you have contact with?

25          MR. NAZAIRE:  Mark Lutz, Your Honor.

1        THE COURT:  Who?

2        MR. NAZAIRE:  Mark Lutz.  It's L-U-T-Z, Your Honor.

3        THE COURT:  I thought you said he was with Prenda Law.

4        MR. NAZAIRE:  He has not really explained this to me.  But

5   what I've heard is that he's a paralegal for Prenda Law.  But as far

6   as my contacts with him, he says that he is the representative of AF

7   Holdings, Your Honor.

8        THE COURT:  Well, "representative," what does that mean?

9        MR. NAZAIRE:  He's the agent that represents them, that makes

10  decisions for them, Your Honor.

11       THE COURT:  You never knew who a corporate officer was?

12       MR. NAZAIRE:  Your Honor, he states that he's the CEO, but I

13  have not seen any -- to answer your question --

14       THE COURT:  He said he was the CEO?

15       MR. NAZAIRE:  I have not seen any documents that --

16       THE COURT:  But he told you that?

17       MR. NAZAIRE:  Yes, Your Honor.  But I have not spoken to

18  anybody else from AF Holdings, Your Honor.

19       THE COURT:  So are you stating that when you were relying upon

20  whatever you relied upon, you're relying upon what Mr. Lutz told you?

21       MR. NAZAIRE:  That is correct, Your Honor.

22       THE COURT:  Now, did he ever tell you that Mr. Cooper was an

23  employee, officer or director of AF Holdings?

24       MR. NAZAIRE:  No, Your Honor.  He told me that Mr. Cooper was

25  a representative of AF Holdings.  He didn't say -- he did not tell me

1  he was an officer of AF Holdings.

2          THE COURT:  He told you he was what?

3          MR. NAZAIRE:  From what I understand, he told me he was a

4  representative of AF Holdings.  He didn't give me the exact title.

5          THE COURT:  What actually was Mr. Cooper's position, do you

6  know?

7          MR. NAZAIRE:  Your Honor, as I stand here, no, I do not know,

8  Your Honor.

9          THE COURT:  It's alleged in some of these pleadings that he

10  was a yardman for somebody; is that correct?

11          MR. NAZAIRE:  I saw some papers from another -- from other

12  cases, one specifically in California where -- actually, there was a

13  -- there was a case called Harrison, Arizona that says that he used

14  to take care of the property -- that John Steele owned two properties

15  and that Mr. Cooper took care of one of the properties for him,

16  that's what I remember.  But I cannot verify that, Your Honor.

17          THE COURT:  When the Motion for Sanctions in this case was

18  filed by the defendant, did you notify AF Holdings in any way of that

19  motion?

20          MR. NAZAIRE:  Yes, I did, Your Honor.

21          THE COURT:  Did they indicate they wanted to appear or contest

22  it?

23          MR. NAZAIRE:  That -- well, yes.  They said that they want to

24  contest it, Your Honor.  But from what I told them, this was not an

25  evidentiary hearing and so I did not ask them to appear, Your Honor.

1         THE COURT:  Who did you have contact with in that regard?

2         MR. NAZAIRE:  Your Honor, I spoke with Mr. Mark Lutz, Your

3    Honor.

4         THE COURT:  Mr. Lutz?

5         MR. NAZAIRE:  Yes, Your Honor, absolutely.

6         THE COURT:  You said it wasn't an evidentiary hearing.  I was

7    anticipating that you would have evidence, one or the other or both

8    of you.

9         All right.  Did you ever have any contact with or know anybody

10   connected with or affiliated with Heartbreaker Digital, LLC?

11        MR. NAZAIRE:  No, Your Honor.

12        THE COURT:  Who was Raymond Rogers?

13        MR. NAZAIRE:  Your Honor, from what Mr. Lutz explained to me,

14   he's a representative from Heartbreaker, LLC, Your Honor.

15        THE COURT:  Representative of what?

16        MR. NAZAIRE:  From what I remember, from Heartbreaker, LLC.  I

17   don't know his title, Your Honor.

18        MR. CHINTELLA:  Your Honor, if I could provide any

19   documentation.

20        THE COURT:  You'll get your chance.

21                      [off-the-record discussion]

22        MR. NAZAIRE:  Your Honor, can I just say one more thing while

23   he's pulling up --

24        Your Honor, I apologize for the way this appears, but my

25   history -- before I worked for this, I used to work -- I used to do

 1  work up in New York for credit card companies and basically the way I

 2  did it was -- for example, we had clients such as Citibank, American

 3  Express, Chase.  I never dealt with the president of Citibank.  I

 4  never dealt with shareholders of American Express.

 5      THE COURT:  But we all know who those companies are and what

 6  they are.

 7      MR. NAZAIRE:  I understand your argument, but I just want to

 8  let you know it's --

 9      THE COURT:  You're not suggesting that Heartbreaker is a

10  Citibank or anything comparable to Citibank, are you?

11      MR. NAZAIRE:  Absolutely not, Your Honor.

12      THE COURT:  Now, in your corporate disclosure statements you

13  state that AF Holdings does not have a parent corporation that owns

14  10 percent or more of its stock?

15      MR. NAZAIRE:  Yes, Your Honor.

16      THE COURT:  What's the significance of the 10 percent?

17      MR. NAZAIRE:  Your Honor, from what I looked at the statute,

18  that's what the statute requires is to say whether or not -- that's

19  what the law requires is whether or not there were other corporations

20  that owe 10 percent or more, from what I remember while I was filing.

21  But from what I understand, Your Honor, there's not another -- they

22  don't have a parent corporation, from what I understand.

23      THE COURT:  How do you know that?

24      MR. NAZAIRE:  I don't know that, Your Honor.  It's just I'm

25  stating what I -- what I should say is there's nothing that indicates

1    at all that -- there's no -- I don't have any paperwork or anybody's

2    ever told me that there's another corporation that owns them or that

3    they have a corporate -- that they have a parent corporation.

4          THE COURT:  All right.  Anything further you wish to add?

5          MR. NAZAIRE:  Not at the moment, Your Honor, unless the Court

6    has -- no, Your Honor, I have nothing further to say, Your Honor.  I

7    just want to remind the Court that I am not a member of Prenda Law.

8          Is that it, Your Honor?

9          THE COURT:  You're not a member of Prenda Law?

10         MR. NAZAIRE:  Yes, Your Honor.

11         THE COURT:  Then why did you put their name down as counsel in

12   this case?  You're a member of the Georgia Bar, are you not?

13         MR. NAZAIRE:  Yes, Your Honor.

14         THE COURT:  Are they a member of the Georgia Bar?

15         MR. NAZAIRE:  No, Your Honor.

16         THE COURT:  Were they admitted by *pro hac vice*?

17         MR. NAZAIRE:  No, Your Honor.

18         THE COURT:  All right.  We'll take a -- I'll hear in rebuttal

19   from Mr. Chintella, but we're going to take a recess first.  We'll

20   take a ten-minute recess.

21         [a recess was taken from 11:35 a.m. until 11:45 a.m.]

22         MR. CHINTELLA:  I gave opposing counsel a CD with the

23   documents in electronic format for convenience and I was wondering if

24   the clerk or Your Honor would want a copy for convenience.

25         THE COURT:  You can give it to my clerk.

1    MR. CHINTELLA:  I'd like to go through a few more pieces of

2    evidence, Your Honor, they're on the computer.  But I'd like to first

3    address some of the things that were said, if that's alright.

4        First, to the extent the allegations -- or the mention of

5    Steele and my relationship, I've only spoken to John Steele once,

6    that I can recall, ever in my life.  Essentially that has come -- to

7    me, legally it appeared as a smokescreen, essentially, something that

8    was made up.  I'm willing to state under oath I've only talked to

9    Steele, as I can recall, once.

10       As far as illegal interstate phone calls, federal law is

11   one-party consent and Georgia is one-party consent and New York is

12   also one-party consent.  The other times I was aware that Nazaire was

13   in Georgia.  I only recorded a few phone calls for importance there.

14       I'd also like to give the Court this sheet here.  Your Honor,

15   mention was made of -- or questions were asked regarding who

16   Mr. Nazaire talked with in regards to this case.  He specifically

17   said that he did not talk to Steele as far as fighting the sanctions

18   motion, but apparently he had talked to him about some bad blood

19   between me and John Steele.  So essentially what Steele's role is in

20   the Prenda organization is he is the primary contact with the client,

21   and the client is Mark Lutz, essentially, and himself, John Steele.

22       Mark Lutz is a paralegal at Prenda Law.  He's also appeared in

23   courts across the country as a corporate representative.  In the

24   materials I've submitted -- the Florida case, the *Sunlust* case, Judge

25   Scriven down there questioned what in the world is a corporate

1    representative and dismissed Lutz and invited a sanctions motion

2    because of his misrepresentation about his role in the company.

3           Steele, incidentally, was sitting in on that hearing and he

4    said that he had no role in the case and didn't know anything about

5    as his current -- or Prenda's paralegal sat up there, essentially.

6           But what I've handed you is, sort of, a timeline.  In 2011, in

7    August, Steele changes his address to Florida, and the document is

8    there.  It's a Court filing.

9           In January of 2012, four months later, Steele says that Prenda

10   Law consists of Joseph Perea and Mark Lutz, which escapes me how a

11   non-attorney can be part of a law firm; namely, Mark Lutz.

12          Three days later -- three days after he mentioned that he

13   lists his name as a contact for Prenda in a court filing in Arizona.

14   Two days after that Joseph Perea, who's also subject to an

15   unauthorized practice of law in Florida, states that Steele has no

16   role with Prenda, and Steele is actually a client of Prenda and owns

17   an interest in several of Prenda's larger clients.  But other than

18   that, he has no role.

19          These are set forth in chronological order, Your Honor.

20   There's a constant deception about the roles of John Steele and Paul

21   Hansmeier, as the evidence we filed will show.

22          I'd like to, if I could, go to the table here and pull up some

23   more exhibits for Your Honor.

24          THE COURT:  Okay.

25          MR. CHINTELLA:  The first one is a filing with the Florida

 1    Secretary of State and it is filed -- can you hear me, Your Honor?

 2           THE COURT:  No, not when you're sitting down like that.

 3           MR. CHINTELLA:  Can you hear me now, Your Honor?

 4           The first filing is a filing with the Florida --

 5           THE COURT:  If you're going to use your thing, you should have

 6    had it installed where you could use it at the bench.  Don't you

 7    have the --

 8           MR. CHINTELLA:  Is it alright if I have my assistant help me

 9    with the computer?

10           THE COURT:  Well, if he can.

11           MR. CHINTELLA:  Okay.  Can you shift between the documents?

12           THE COURT:  Let me ask you this.  I thought I had made it

13    clear in your beginning argument that I thought you were -- I didn't

14    use these words, but you were firing with a thunder burst, you were

15    trying to deal with things all over the country rather than focusing

16    on this case.

17           You're asking the Court to take judicial notice of all sorts

18    of court documents from all over the country.  I think if you're

19    going to ask the Court to take judicial notice or you're going to

20    tender them into evidence as an exception to the hearsay rule as

21    being official records --

22           MR. CHINTELLA:  Yes, Your Honor.

23           THE COURT:  -- that you need some sort of authentication of

24    them.  We don't just take a bunch of pieces of paper with printing on

25    them --

1          MR. CHINTELLA:  Yes, Your Honor.

2          THE COURT:  -- and say this is something you take judicial

3    notice of.  I have no problem with records of this Court, we can take

4    judicial notice of those because we can draw them up.

5          MR. CHINTELLA:  Yes, Your Honor.

6          THE COURT:  And we maybe can draw records from other courts

7    up, some of whom are on computerized records.

8          MR. CHINTELLA:  Yes, Your Honor.

9          THE COURT:  I don't think all of the courts in the country are

10   yet, but some are.  To some extent, we maybe can, you know, ourselves

11   draw those up, you know, bring them up.  But I think they need some

12   certification by the clerk that they are records filed in their

13   court.

14         Now, that doesn't mean that they're -- that they prove the

15   truth of what's alleged in them.  It just means that they were filed.

16   I don't know whether you're needing all of that or not.  We're more

17   concerned -- if you need to show that something was filed that

18   alleged something differently than what's been alleged here, then

19   that may be relevant.  But if you're trying to offer it for the proof

20   of what was stated there, you may have more difficulty.  But I'm

21   concerned with the manner in which the evidence's been presented.

22         Now, you've got an expert here.  I don't know whether you were

23   planning to put him on or not.

24         MR. CHINTELLA:  Yes, we were, Your Honor.  Mention was made of

25   the forensics company of Prenda and that was on the list here to at

1   that point bring him up.

2        THE COURT:  Well, I'll certainly allow you to present him and

3   then -- we've got to separate this somehow and focus on it and deal

4   with it in an organized fashion and I don't feel that it's -- that

5   we're receiving it in that organized fashion from either side.  I'm

6   not critical of just one, but both of you.

7        MR. CHINTELLA:  I'm more than happy to authenticate most of

8   the documents myself because I obtained them myself through Pacer.

9        THE COURT:  How do you authenticate a court record?

10        MR. CHINTELLA:  I'm sorry, Your Honor?

11        THE COURT:  How are you going to authenticate them?

12        MR. CHINTELLA:  I pulled them from the federal system.

13        THE COURT:  Where did you go to law school?

14        MR. CHINTELLA:  Georgia State University, Your Honor.

15        THE COURT:  Unless they're teaching efforts different than I

16   learned it -- if you could do that, all we'd need to do is call an

17   FBI agent in here in most criminal cases and let him authenticate

18   everything he's gone out and picked up.  He can go to the telephone

19   company and bring bills in here and say "I got these from the

20   telephone company and they're authentic records of theirs," and I

21   wouldn't have to sit here and listen to the custodian of those

22   records bringing them in.  I may be a little old fashioned but, to

23   me, the law is old fashioned.

24        MR. CHINTELLA:  Absolutely.

25        THE COURT:  And when we get away from the *stare decisis*

 1  precedence of the law we're ceasing to have a nation of laws.  We're

 2  beginning to have a nation of individuals, not laws.  I don't think I

 3  -- hopefully we'll never get to a point where a lawyer comes in and

 4  says "This is my investigative file," and I'll swear these are the

 5  records.  If that's what you're offering to do, you're wasting your

 6  time.  You'd have to show me some mighty good law -- some strong law,

 7  I won't say "good," I question that it would be good -- that would

 8  permit such.

 9        I realize I may not have much experience in this regard; I've

10  only been practicing law and on the bench for just a little over 60

11  years.  So maybe I need a little more experience in that regard.

12        MR. CHINTELLA:  I'll take that to heart.

13        As far as the judicial -- or the records on dockets, my plan

14  was to authenticate them -- you know, provide copies, which is what

15  the rule requires in order to take judicial notice.

16        THE COURT:  Well, in most lawsuits documentation doesn't have

17  to be authenticated because it's presented at a pretrial conference

18  and the parties agree to it and unless they object to it, then you

19  don't have to call witnesses authenticating it.

20        If you've got agreements that these documents are authentic,

21  that's fine.  But in absence of that, you're going to have to have

22  some legitimate evidence to authenticate that this is a document

23  that's on file wherever it's on file.  If it's a court record, that

24  it was on file in whatever clerk's office that it is and it's

25  documents filed on such and such a date, whatever.

1    MR. CHINTELLA:  I actually tried to reach out to Mr. Nazaire

2  to expedite this so we could stipulate to the authentication process,

3  but I did not get a response.  I did that probably three or four days

4  ago.

5    THE COURT:  Well, let me ask you this -- I maybe should have

6  asked him.  Well, I guess you.  You need to think that just as much

7  I'm not going to be influenced by this inflammatory stuff that you

8  send in just the same as I'm not going to be influenced by this

9  inflammatory material that he sends in.  Hopefully that's what

10  separates our judicial system from other forms of government.

11    But you've alleged, among other things, that from California

12  and somewhere else -- I know there are things going on in Texas and

13  Florida and Arizona and I remember those, at least those three places

14  -- that there was a request for a criminal investigation.

15    MR. CHINTELLA:  That's correct, Your Honor.

16    THE COURT:  Has a criminal case been instigated in regard to

17  any of this?

18    MR. CHINTELLA:  Not to my knowledge.  Judge Wright, in his

19  sanctions order against Prenda and Steele and Duffy and Lutz and

20  everyone, said that he was going to report -- essentially report the

21  situation to criminal investigators in that same building, as well as

22  the IRS.

23    THE COURT:  I think he was going to report it to the US

24  Attorney, which is the appropriate place for the judge to send it.

25    MR. CHINTELLA:  Yes, Your Honor.

 1          THE COURT:  The US Attorney would then take whatever action

 2  with the FBI or whatever investigative agency would be the proper one

 3  to investigate such a thing.

 4          MR. CHINTELLA:  Absolutely, Your Honor.

 5          THE COURT:  I believe he also said he was initiating bar

 6  proceedings.  Now, those may not be public information.  It depends

 7  on each individual state, I guess, but none of those lawyers were

 8  California lawyers anyway.  The only California lawyer withdrew, did

 9  he not?

10          MR. CHINTELLA:  Yes, Your Honor.  Mr. Brett Gibbs was their

11  California man, essentially, and he eventually withdrew, yes, Your

12  Honor.

13          THE COURT:  And all the rest were from either Illinois or

14  somewhere else?

15          MR. CHINTELLA:  They have attorneys in, I would venture to

16  say, at least 12 to 15 states, Your Honor.

17          THE COURT:  I'm talking about the ones in California that the

18  judge out there was talking about.  Well, go ahead because we're

19  going to deal with this matter.

20          MR. CHINTELLA:  Okay.

21          THE COURT:  And tell me what else -- how much more time you

22  need to present what you're going to present today.

23          MR. CHINTELLA:  Your Honor, the expert testimony would

24  probably take 15 to 20 minutes, and I can run through several of

25  these documents, authenticate them, hopefully, in under less than

```
 1  ten -- five minutes.

 2          THE COURT:  You're optimistic.

 3          MR. CHINTELLA:  We would be okay with, you know, having more

 4  discovery and being able to get more direct --

 5          THE COURT:  You say "more discovery."  You haven't had any,

 6  have you?

 7          MR. CHINTELLA:  Well, I misspoke.  I meant some discovery

 8  about this case and uncovering the bad faith.

 9          We've had to rely on the stuff from other courts because they

10  dismiss these lawsuits routinely whenever somebody puts up a fight.

11  That is their business model.  It's an economies of scale business

12  model.  They sue the large John Doe grouping, they get as many

13  settlements as possible, they try to make examples out of people who

14  resist, they put them on their website and then they dismiss them.

15          With that in mind, I was going to mention this first document

16  here.  This is a document that I guess I'll attempt to authenticate

17  it, Your Honor.  It's a document -- I went to a Secretary of State's

18  website and I pulled from their records and I downloaded it and it's

19  been in my custody ever since and it hasn't changed, to my knowledge.

20          Can you scroll down, Andrew.  Stop right there.

21          This is Prenda Law's registration as a foreign entity in

22  Florida, and you'll see Paul Duffy and you'll see the Lincoln Road

23  address right below him.

24          Scroll down a little bit, Andrew, please.  Again stop.

25          You'll see the Chicago address, which is on their demand
```

1  letters that they send out to people, 161 North Clark Street and

2  legal services is the -- that's irrelevant.  It's obvious.

3         Would you scroll down, please.  Keep going.

4         The officers are Paul Duffy.  This is despite the statement in

5  Florida that Joseph Perea and Mark Lutz consist of the law firm.

6         Scroll down, please.

7         THE COURT:  All right.  Now, that appears -- there is a

8  certificate.  Where's the original and the seal and everything that

9  goes on that?

10        MR. CHINTELLA:  The original -- obviously, I did not get a

11 copy of the original, Your Honor.

12        THE COURT:  You mean they print out -- all of this is printed

13 out?

14        MR. CHINTELLA:  Yes, Your Honor.  It's available on the

15 State-owned website and the secretary of the office there provides

16 these documents to the public for free.

17        THE COURT:  All right.  Go ahead.

18        MR. CHINTELLA:  Can you go to the next one.

19        THE COURT:  All right.

20                    [off-the-record discussion]

21        MR. CHINTELLA:  May I proceed, Your Honor?

22        THE COURT:  Go ahead.

23        MR. CHINTELLA:  This next document I downloaded from the same

24 website.  It's been in my possession, hasn't changed, has not been

25 altered, and it's a foreign registration for Steele Hansmeier, which

```
 1   is the predecessor to Prenda that was created by Paul Hansmeier.
 2   It's a Minnesota company.  The principals are John Steele and Paul
 3   Hansmeier, law school classmates.
 4           If you'll scroll down, please.
 5           You'll notice the same Lincoln Road address there in the
 6   center.
 7           Scroll down, please.
 8           Paul Hansmeier's name is listed there as the principal.
 9           Stop, please.
10           You'll see Mark Lutz's name right there.  He's listed as the
11   registered agent and he's also listed as the registered agent at that
12   same address in Florida.  This is Mark Lutz, who's also the paralegal
13   of Steele Hansmeier and Prenda and who's also, according to
14   Mr. Nazaire, the CEO of AF Holdings, the client of Prenda.  He's also
15   the figure who appeared in Florida claiming to be a corporate
16   representative of *Sunlust* in the *Sunlust* case that we reference in
17   our materials.
18           Scroll down, please.  Next one.
19           Media Copyright Group, this is a Minnesota company.
20           THE COURT:  That last one --
21           MR. CHINTELLA:  Yes, sir.
22           THE COURT:  -- what was the entity that he was listed as?
23           MR. CHINTELLA:  Prenda Law.  So he was the registered agent
24   for Prenda in Florida -- or he still is, actually.  That is still
25   current.
```

1        THE COURT:  The registered agent for Prenda?

2        MR. CHINTELLA:  Yes, it is, Your Honor.  It's still current.

3        THE COURT:  That, supposedly, is a law firm?

4        MR. CHINTELLA:  It's a law firm that Paul Duffy is listed as

5   the principal of.  So when we refer to "of counsel of Prenda Law," it

6   is that same company --

7        THE COURT:  Okay.

8        MR. CHINTELLA:  -- from Illinois.

9        THE COURT:  All right.

10       MR. CHINTELLA:  This next company is MCGIP, LLC.  It was

11   originally -- well, let me just say that I pulled this document from

12   the Minnesota website run by the Secretary of State and it hasn't

13   changed possession and it hasn't been altered at all.  This is a

14   company -- if you'll notice, the manager is Alan Mooney and the

15   address here is 80 South 8th Street, Suite 900 in Minneapolis,

16   Minnesota.

17       And I'll pull up another -- excuse me.  I'll pull up another

18   record, Your Honor.  That is the same address as Paul Hansmeier's law

19   firm in Florida.  And MCGIP, I can pull up many examples of where

20   Steele Hansmeier, the company, and Prenda filed lawsuits on behalf of

21   MCGIP.

22       So what we have is a company formed a law firm, the two

23   principals of which are John Steele and Paul Hansmeier, they form a

24   company called MCGIP and they file lawsuits on behalf of it.  And

25   there is a company called Media Copyright Group, which it's not hard

1  to see the similarities, "MCG," instead of "IP," which we think

2  stands for intellectual property.

3      So there's a company called Media Copyright Group, which I'll

4  also show you, that Peter Hansmeier, Paul Hansmeier's brother,

5  submits these technical reports through.  Now, he has since moved on

6  from that period in time to work for 6881, but that was the initial

7  start of these very incestuous, closely related companies.

8      Can you go to the next one.  Oh, I'm sorry.  Stop, Andrew.

9      You'll see right there where it says "Principal Executive

10  Office," it actually says "In care of Alpha Law Firm," on the left

11  side of the sheet there.

12      Next one.

13      You can -- well, this is the -- this is not -- this is

14  something that I brought up when you were questioning opposing

15  counsel.  This is the Secretary of State information for Heartbreaker

16  Digital and so it does, in fact, list Raymond Rogers.  I pulled this

17  from their website and it's been in my possession, has not been

18  altered at all.  So it does list Raymond Rogers which appears to be

19  that same signature on the assignment agreement.

20      You can close that one out, please.

21      Here is that company Media Copyright Group.  This is a

22  Minnesota company.  I pulled this document from the same website,

23  Minnesota Secretary of State.  It has not been altered at all.

24  You'll see the manager on the right column there is Peter Hansmeier,

25  that's Paul Hansmeier brother, and it lists the same Alpha Law

1    address.

2         Close that out, please.

3         Here we have a company -- there are many of these companies,

4    Your Honor.  I just tried to pick out the ones that are the most

5    enlightening, as far as the relationships between the relevant people

6    here.

7         This is one that was recently filed.  I pulled it from the

8    Florida Secretary of State's website.  It has not been altered at

9    all.  What it is -- it was filed on April 24th.  So this is well

10   after Judge Wright's sanctions order, well after opposing counsel,

11   myself, had been talking about these issues.

12        This is a company called Bessemer Films, LLC.  And you'll

13   notice in Article 2 there it lists the same address, the Lincoln Road

14   address, both for Steele Hansmeier and Prenda Law Firms where Mark

15   Lutz is also the registered agent and he lists that same address in

16   Florida.  So that Lincoln Road address is, essentially, their base of

17   operations in Florida.  This is the reason why a UPL complaint was

18   filed against them in Florida.  John Steele was sending out letters

19   from that address down there.

20        THE COURT:  What kind of complaint?

21        MR. CHINTELLA:  An unauthorized practice of law.

22        THE COURT:  Oh, okay.

23        MR. CHINTELLA:  And some of the evidence in our filings have

24   those responses, and I checked the admissibility rules on that.  The

25   person who filed the complaint can disclose it, but anyone else

1   cannot.  But once it's disclosed it is disclosed.  So Graham Syfert,

2   this attorney, he's the one that filed it and he disclosed it and

3   then from that point forward it's, sort of, a -- it's already

4   disclosed in the public record.

5         So I'd like to point out with Bessemer -- I looked up on

6   Dictionary.com yesterday.  The Bessemer process is defined as, and I

7   begin quote, "A process of producing steel in which impurities are

8   removed by forcing a blast of air through molten iron."  So it's a

9   reference to, we think, John Steele.

10        This is another company -- if you'll scroll down, Andrew,

11  please.

12        Mark Lutz, Article 4 there.  You see Mark Lutz's name also at

13  the Lincoln Road address.  Same Mark Lutz that is the purported CEO

14  of the plaintiff, the same one who's the paralegal for Prenda, the

15  same one who, as we'll show, has an interest in this mysterious trust

16  based in Saint Kitts and Nevis.  It's an undefined beneficiary trust,

17  according to Paul Hansmeier in his deposition, but Mark Lutz's unborn

18  children are the beneficiaries.  We can bring up that deposition.

19        Can you close that out, please.  Scroll down.  Actually, close

20  that one out.

21        Here, Your Honor, is a document I pulled from the Illinois

22  Secretary of State's website, it has not been altered and is the

23  Anti-Piracy Law Group and it was formed -- if you look on the left,

24  second to most left column, four boxes down, it was formed on

25  November 8th, 2012.

1          Scroll down, please.

2          And the address on the far right column, you'll see, is that

3    same address, 161 North Clark Street, Suite 3200, which is the

4    address for Prenda, which was also the address for Steele Hansmeier

5    in Illinois and principal -- the principal is Paul Duffy.

6          Can you scroll down, Andrew, please.  Click on the other

7    document in that folder.

8          This is also a document that I pulled from the same Illinois

9    Secretary of State website.  You can see there it lists Paul Duffy,

10   who is, essentially, the figurehead of this company.  So he's the

11   figurehead of Prenda and now Anti-Piracy Law Group.

12         Go to the Company folder, please.  VPR, Inc., second file

13   down.

14         Here is a record that I pulled from the Nevada Secretary of

15   State's website, their official website.  It has not been altered and

16   hasn't left my possession on my personal computer.  What it is is

17   it's a summary of VPR, Inc., another company.

18         If you'll scroll down, Andrew.

19         Under the Officer's category there, you'll see Alan Cooper,

20   which is the same Alan Cooper's signature that we allege is forged,

21   for AF Holdings as the assignee for the copyright in this case.  It's

22   also the assignee or the representative for Ingenuity13, which is

23   another company that was involved in that consolidated case in

24   California.

25         Scroll down, Andrew.  You can close that out.  Go to

1   Ingenuity13.  Close that out.  Go to companies in Peg Leg

2   Productions.  Second file down.

3          This is another -- a company called Peg Leg Productions, LLC,

4   and I pulled this document from the official Secretary of State's

5   website and it has not been altered.  This was filed on May 28th, so

6   relatively recently.  May 28th of this year.  If you'll scroll down,

7   you'll see in Article 2 that the same address -- the Lincoln Road

8   address -- as Prenda and all the other companies I mentioned.  If you

9   scroll down to Article 4, you will see Mark Lutz as the registered

10  agent.

11         Scroll down, Andrew.

12         The electronic signature of Mark Lutz.

13         You can close that out.  Go to Companies.  I'm sorry.  Go back

14  to Peg Leg.  Peg Leg's first file, please.  Scroll down, Andrew.

15         Here's a lawsuit, it was filed in -- shoot -- Illinois and

16  it's filed in State court in Illinois and here's the signature of

17  Paul Duffy representing Peg Leg.

18         If you'll scroll down, Andrew.

19         And there's the signature of Mark Lutz verifying to, I guess,

20  their Local Rule 1-109, that the facts and statement are accurate.

21         Scroll down, Andrew, a little bit.  All right.  That's good.

22  You can close that out.

23         I was unable to find any information on Livewire Holdings.  I

24  filed a corporate disclosure statement listing it because a mention

25  was made of it in the California case.

 1          Andrew, can you go up a level to Companies and -- one more

 2    level.  People.  Mark Lutz.  Sorry, go back to People.  John Steele.

 3    Okay.  Fourth from the bottom.  That one.

 4          So here, Your Honor, is a docket that I pulled from the

 5    federal Pacer system and these are John Steele's -- where he is an

 6    attorney of record.  So you see there the Media Copyright Group,

 7    which is the same company we spoke about, and then there's MCGIP,

 8    LLC.  So what happened is that when Steele Hansmeier, they shifted

 9    their business model into Prenda, all the people from -- all the

10    clients and people from Steele Hansmeier went to Prenda.  So you'll

11    see lawsuits filed across the country the same companies by Prenda.

12    They're of counsel attorneys.

13          You can close that out.  Go to People.  Brett Gibbs, fourth

14    from the bottom.

15          Here's a case I pulled from Pacer, it has not been altered at

16    all.  This is the same plaintiff as in this case.  You'll notice in

17    the second box down you'll see Prenda Law, Inc. listed as the law

18    firm.

19          Scroll down, Andrew.  Sorry.  Go up just a smidge.  There you

20    go.

21          The signature on the bottom there, that's the signature of

22    Brett Gibbs.

23          It's a little unclear so if, Andrew, you'll scroll down to the

24    bottom where the signatures are.

25          There's an electronic signature of Brett Gibbs.  This is the

1 same Brett Gibbs -- you'll see the same email address, rather, below

2 his signature.

3          THE COURT:  What court is that in?

4          MR. CHINTELLA:  This is in California, Your Honor, I believe.

5          Can you scroll up to the very top, Andrew.

6          He's only licensed in California, so I assume that, but I'll

7 make sure.

8          Scroll down, Andrew, a little bit so you can see the top of

9 the complaint.  A little bit more.  Apparently there was a mistake in

10 the filing on Pacer.  So Page 2, go up, Andrew.

11          Apparently the style of the case, it looks like, was omitted

12 when it was filed.

13          Scroll down, Andrew.  More.  To the signatures again.

14          Okay.  This was filed in November of 2011.  So that's around

15 the time -- Gibbs actually started filing in March of 2011, that's

16 the earliest cases I could find and that was in California.  I can

17 bring that case up.  Is it alright if I show this case, Your Honor?

18          THE COURT:  You don't need to go into the cases.

19          MR. CHINTELLA:  Okay.  Close it out, Andrew.

20          And so the sheet I handed Your Honor, this is a sheet I

21 created.  What I did is that in Column 2 here, I put the docket

22 number where this information came from, and so this has not been

23 changed or altered.  This is something that I create that is,

24 essentially, work product that I created for the Court's convenience.

25          So you can go to the second column here and go to the

 1  different court case listed there and the pieces of evidence I've

 2  already submitted and to the right is a summary, and if it's in

 3  quotations, then it's verbatim.  We can see John Steele's constantly

 4  changing his information.

 5        You know, like, for example, on April 20th, 2012, he lists

 6  himself as "of counsel" and then he lists his office address as the

 7  same as Prenda's.  This is only -- three months prior, in a UPL

 8  complaint in Florida, states that he has no role with Prenda.  And

 9  then two days before that response was filed Steele lists himself as

10  contact for Prenda, along with Paul Hansmeier and Paul Duffy in

11  Arizona.  And that's Arizona AF Holdings vs. DOES 1 through 20, Case

12  3:11-00491.  It has the Wefightpiracy.com email address for John

13  Steele, Paul Hansmeier, and Paul Duffy.

14        So it's a nationwide, sort of, enterprise.  And for no

15  corporate disclosure statement, no parties with interest submitted in

16  this case, it seems pretty blatantly offensive to the rules.

17        Mark Lutz's involvement, he clearly has an interest.  One

18  thing was mentioned about 6881, if we could stipulate that is the

19  company that Peter Hansmeier currently files these technical reports

20  for.  What I'd like to do is call Andrew up and he can testify a

21  little bit about what 6881 does and they --

22        Essentially, what the evidence submitted recently in the

23  Florida case, and that I requested judicial notice of -- I believe on

24  July 1st, is that 6881 appears to be monitoring these downloadings

25  and encouraging them.  So 6881 is a Nevis-based company as well that

1  Peter Hansmeier works for.  So a technical expert in Florida did this

2  soak is what's it's called, a soak -- and Andrew can explain it

3  better than I can.

4       But it's a soak basically monitoring, without exchanging

5  information, as far as the file itself but the handshakes and the

6  initiating process for the file sharing.  Basically there are four

7  very unique -- call them peers -- that are encouraging at an abnormal

8  rate the downloading of the same works that Prenda is suing for --

9  or, rather, AF Holdings.

10       So with the Court's permission, I'd like to bring up Andrew

11  and he can answer any questions about that technical aspect.  I have

12  a resumé or a *curriculum vitae* for Andrew and I could ask him some

13  basic questions to certify him as an expert depending how the Court

14  would like to proceed.

15       THE COURT:  You said he would take 15 or 20 minutes, I think.

16       MR. CHINTELLA:  Yes, Your Honor.

17       THE COURT:  And you'd said this other stuff you just finished

18  would take 10 minutes and we've been on it for 30 minutes.  So your

19  estimate there, it would take us until somewhere between 1:00 and

20  2:00 o'clock.  I think we'll recess and come back after lunch and do

21  this and you can get anything else you need to present.

22       MR. CHINTELLA:  Thank you, Your Honor.  Is there anything in

23  particular that the Court would like me to focus on other than the

24  obvious --

25       THE COURT:  What do you mean "focus on"?  I'd like for you to

1    focus on what you've asked other than so much other stuff.  You're

2    running your case.

3           Let's recess.  We'll recess until 2:00 o'clock, how about

4    that?

5           MR. CHINTELLA:  Thank you, Your Honor.

6           THE COURT:  All right.

7              [a recess was taken from 12:35 p.m. until 2:00 p.m.]

8           THE COURT:  All right.  Ready to go forward for the defendant?

9           MR. CHINTELLA:  Yes, Your Honor.

10          MR. NAZAIRE:  Your Honor, I object.  Your Honor, I object.

11          THE COURT:  Beg your pardon?

12          MR. NAZAIRE:  I object, Your Honor.

13          THE COURT:  You object?

14          MR. NAZAIRE:  Yes.  To his witness.

15          THE COURT:  Okay.  State your grounds.

16          MR. NAZAIRE:  I wasn't given notice of expert witness.  This

17   is -- I'm just finding out that he has an expert witness that's come

18   here to testify today.  He should have given notice.  I'm sure he had

19   lined him up previously and could have notified the Court or myself

20   that this witness would be here.

21          MR. CHINTELLA:  We just obtained -- just obtained this expert,

22   Your Honor.  When I tried to reach out to discuss some things with

23   Mr. Nazaire, I never got a response.

24          THE COURT:  What are you going into with the expert now?

25          MR. CHINTELLA:  Well, we're planning on going into the

1   argument regarding metadata that we mentioned in our filings and then

2   something we recently requested judicial notice about, which is a

3   filing in the *Sunlust* case in Florida regarding an affidavit by -- or

4   some evidence that 6881, the forensics company, has a hand at

5   actually distributing these copyrighted works.

6        THE COURT:  I'm not sure I understood you.  I don't know what

7   something going on in another court has to do with this, particularly

8   you said recently.

9        See, this is your problem, as I've repeated numerous times,

10  the two of you are trying to litigate issues that are -- you're both

11  wed to dealing with, apparently, the industry that you apparently

12  have different views on and that's not what we're dealing with here.

13  We're dealing with Motions for Sanctions growing out of the filing of

14  this lawsuit in this Court.  Not some lawsuit in another court before

15  or after unless --

16       And as I gather, what you're saying is this is something

17  recently filed, isn't it?

18       MR. CHINTELLA:  Yes, Your Honor.  It was filed, I believe,

19  about a week ago in that case.

20       There are cases across the country and that's, again, one of

21  the issues is that pieces of evidence keep coming forward.  Despite,

22  I guess, the cases being dismissed, they're coming forward very

23  sporadically, I guess, is the way I think of it.  We would -- that's

24  why at the beginning I mentioned possibly getting limited discovery

25  in this particular case, if the Court so chose.

1    MR. NAZAIRE:  Your Honor, the problem here is that you have

2  cases happening in different parts of the country and every time

3  somebody wants to have revenge against Prenda Law or sue for a

4  copyright case, new evidence comes up.  The defense in this case

5  wants to use any evidence it finds without doing its own work.

6  That's very convenient for it to go to Arkansas or Nebraska and get

7  evidence, but had it done its own work, perhaps it would have gotten

8  evidence.

9    Also, there was an affidavit that was filed yesterday evening

10  on the eleventh hour and that affidavit was dated June 3rd, and I'm

11  not sure it was filed on July 1st.  I'm not sure if it was a

12  surprise, but there's a lot of surprises in this case.  There's a lot

13  of documents that come from other states that I, perhaps, would have

14  to travel to Hawaii or Alaska, wherever it's coming from, to verify

15  that they're authentic documents.  We've gotten away from the fact

16  that Rajesh Patel is the one who's being accused of the copyright

17  infringement, Your Honor.  So as to relevancy and surprise, this is

18  objectionable.

19    MR. CHINTELLA:  I guess that's why, from our perspective, we

20  attempted to show a connection between all the people and entities

21  over this period of time is to try and show that they're all, really,

22  one actor working together as basically a partnership.  And I wish --

23    THE COURT:  Well, that's unimportant except to show -- unless

24  it goes to show that there's fraud upon the Court, and that does

25  cause me some concern.

1        I am concerned whether this -- from some of the accusations

2  made, whether this is a legitimate copyright possessed by whoever it

3  is that received it -- the plaintiff in this case, AF Holdings, that

4  could be sued upon, and I'm concerned as to whether the plaintiff

5  knew that and whether the plaintiff's lawyer knew that.  I'm very

6  concerned about -- the thing has broadened based on what I heard this

7  morning a great deal about who's actually the lawyers in this case.

8  Now, that's, sort of, one of the side issues.  The main issue, to me,

9  is determining whether or not this case is a fraud being perpetrated

10 on these defendants and on the public in general.

11        You've asked about discovery and I'm inclined to allow each of

12 you to have some discovery, if you wish, but not much.  There's not

13 much time.  You can have all the discovery you want but within a

14 short period of time.

15        This matter needs to be disposed of.  Unfortunately, I'm going

16 to be on trial -- well, we couldn't have another hearing in that

17 period of time anyway, but I'm going to be on trial and then I'll be

18 sitting with the appellate court and it'll be -- therefore, it'll be

19 after that time before we can have some further hearing in regard to

20 this.

21        I think I'll wait and let you try to focus on what it is

22 you're trying to prove and show.  But I get frustrated trying to

23 focus on something dealing with this case when all I hear about is

24 California and Arizona and Florida and wherever else, Illinois and

25 the District of Columbia and other places, Texas.

 1          Now, I'm not interested in litigating any cases from there.

 2  We've got enough of them here.  Now, there weren't that many AF

 3  Holdings, Inc. cases in this district, but there are a lot of other

 4  cases that appeared to be very similar --

 5          MR. CHINTELLA:  Yes, Your Honor.

 6          THE COURT:  -- in other names where they were filed and

 7  dismissed before there was ever an answer, which is a very unusual

 8  procedure.  Have a seat, gentlemen.

 9          MR. CHINTELLA:  Thank you.

10          THE COURT:  Stand when you're speaking.  You don't have to

11  stand there the whole time.  When you're addressing the Court, I

12  can't hear you if you don't stand.

13          I will go through and try to indicate what documents we'll

14  take judicial notice of.  As I said this morning, anything involving

15  this Court I have no problem with and it may be -- and I think I

16  expressed this, that under our Pacer system that we maybe can take

17  judicial notice of other federal filings.  But you must keep in mind

18  that there's a limit to you take judicial notice as to what they can

19  be used for.  I question that and take judicial notice of some

20  affidavit filed in another case and that becomes substantive evidence

21  in this case.

22          Now, taking judicial notice of a docket in another case, if it

23  indicates who the attorneys are and the parties are in that case, if

24  that's relevant, would certainly be something that could be used.

25  But you don't just try a lawsuit by running around and asking the

1   Court to take judicial notice of every document that's been filed

2   somewhere, that you can pull up and certify yourself that you got it

3   out of the records.

4        Now, there's one or two of the State court documents you've

5   tendered that we can either take judicial notice of or they're

6   admissible as an exception to the hearsay rule, whichever way you

7   approach it is relatively unimportant, as long as you can use them.

8        Like the one you had from Florida, it's still got to be

9   relevant and material to the issue before the Court.  The mere fact I

10  say I'll allow you to use it by taking judicial notice of it doesn't

11  mean the Court's going to consider it as far as some substantive

12  matter contained in it that may be subject to dispute otherwise.  You

13  just get in --

14       But nevertheless, I'm going to allow you a limited period of

15  discovery in this case for each of you.  I don't know whether the

16  plaintiff wants to do any discovery or not, but each of you certainly

17  have the opportunity to do so and each of you have Motions for

18  Sanctions pending.  Neither of you have yet given me much in the way

19  of direction of what your sanctions you're requesting are.  You've

20  given me some general statements.  I can deal with that, I guess, to

21  some extent, but it's not very explicit, and I'll allow you time to

22  try to get that together.

23       How much time do you need for discovery?  Do you need any

24  discovery at all, Mr. Nazaire?

25       MR. NAZAIRE:  It depends, Your Honor.  I'd like to depose

```
 1   Mr. Rajesh Patel.
 2           THE COURT:  Depose who?
 3           MR. NAZAIRE:  Mr. Patel.
 4           THE COURT:  Oh, Mr. Patel, okay.
 5           MR. CHINTELLA:  We would object to that, Your Honor.  The case
 6   has been dismissed.  So right now I guess we view discovery as more
 7   aimed at the pre-filing investigation and issues like that, which
 8   would involve, from our side, you know, technical experts, officials
 9   at Prenda Law, in that vicinity.
10           THE COURT:  I can't hear you.
11           MR. CHINTELLA:  I'm sorry, Your Honor.  I'm sorry, Your Honor.
12           From our perspective, the case has been dismissed voluntarily
13   and I guess that creates a problem because we don't believe it can be
14   reopened.
15           THE COURT:  If you want me to insist upon that, then we can
16   just end these hearings today and all go home.
17           MR. CHINTELLA:  Well, we'd rather have discovery and have a
18   chance at getting my client's attorney's fees back than losing out on
19   that.  But what, I guess, our position is is that we would want
20   discovery about the technical reports and the pre-filing
21   investigation and the relationship between local counsel and Prenda.
22           THE COURT:  I asked Mr. Nazaire, and he said, I gather, just
23   the one witness that you would want to discover?
24           MR. NAZAIRE:  You know, Your Honor, I take that back, Your
25   Honor.  I don't need to depose Mr. Patel because this case is a
```

1  dismissed case.

2       THE COURT:  All right.  Well, how many witnesses is it you

3  anticipate you would want to have discovery on?  Post-judgment

4  discovery is not unusual.  It's done quite often --

5       MR. NAZAIRE:  Your Honor --

6       THE COURT:  -- in an appropriate post-judgment matter.

7       MR. NAZAIRE:  Your Honor, I believe I just would need

8  interrogatories to be sent to Mr. Patel.

9       THE COURT:  Beg your pardon?

10      MR. NAZAIRE:  I would just like the opportunity to send

11 requests for interrogatories to Mr. Patel and that should cover it.

12 Instead of bringing him in and wasting his time.

13      THE COURT:  Okay.  As part of discovery you can do that.

14      MR. CHINTELLA:  From us, Your Honor, we'd probably need

15 interrogatories, as well as some requests for inspection, that sort

16 of thing.

17      Unfortunately, our perspective of Prenda's business model is

18 that they tend to use forged things and produce -- like the affidavit

19 in this case, for example, that's not sufficient under Florida law.

20 So we would ask for a little bit more expansive range of tools,

21 including depositions, if necessary, subject to the Court's

22 discretion of deponents.

23      THE COURT:  How long do you think it would take you?  That's

24 what I'm trying to ask you.

25      MR. CHINTELLA:  I would estimate -- if we could do an

1    expedited response time, if opposing counsel and myself could agree

2    to that, one or two months.  My estimating skills are not the best,

3    but I would estimate one or two months, Your Honor.

4          MR. NAZAIRE:  Your Honor, I just want to object to him -- I'm

5    not sure what exactly he would need to inspect.  I think probably

6    closer -- I'm not sure.  I would need time to send -- to notify

7    Mr. Lutz.  If he needs discovery, I probably need, maybe, 60 days to

8    get it to him.  I'm not sure exactly what he's going to ask for.

9    Sixty days to either get it or to object to it.

10          THE COURT:  All right.  I'm going to authorize discovery and

11   you better get started with it immediately and it better be immediate

12   answers.  If there are problems, then I'll address them with -- try

13   to address them with dispatch even though we're inundated otherwise.

14   I'll give you -- both of you've indicated the outside of two months.

15   I'll give you two months for discovery in this matter.

16          MR. CHINTELLA:  Can I ask a question, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. CHINTELLA:  Are there any -- is there any limit on the

19   discovery devices we can use or is it just...

20          THE COURT:  Do you want to use interrogatories or do you want

21   to take depositions or requests to produce or whatever?  I mean, I'm

22   giving you discovery for a period of two months.  But if you don't

23   start immediately, you won't be very effective in a two-month period

24   of time.

25          All right.  We will, in the meantime, try to give you some

1    indication as to which ones of these documents you've talked about

2    which you can rely upon and utilize in evidence.  I don't remember --

3    how many of you requested the Court take judicial notice of?  I know

4    you've filed two or three in the last two or three days.

5        MR. CHINTELLA:  I believe I filed one in the last day, maybe

6    two in the last week.  I think total number of documents -- I would

7    say 15.  My best estimate is 15.

8        THE COURT:  So there's 15 documents we've got to -- all right.

9        That means, Mr. Nazaire, if we're not going forward with this

10   deposition today, you have your chance.  If he wants to use the

11   witness at any subsequent hearing, he can do so.  You're on notice.

12       MR. NAZAIRE:  Yes, Your Honor, I'm on notice.

13       Your Honor, once again, I want to object to the relevance of

14   some of these exhibits that he wants to use as -- that he wants

15   judicial notice on.

16       THE COURT:  Have you filed any objections thus far on any of

17   them?

18       MR. NAZAIRE:  The one objection I filed, Your Honor, was on

19   the one from California and the defendant asks for Motions for

20   Sanctions.  So I'm, sort of, apprehensive about filing any more

21   objections because -- yes, he did file for a Motion for Sanctions

22   merely because I filed an objection.  Yeah, it was his motion, which

23   is ECF Number 30, is a Motion for Sanctions merely because I objected

24   to one of the documents.

25       THE COURT:  Which document did you object to?

1          MR. NAZAIRE:  Well, it was the California decision, which I

2     believe was not related to this case.

3          THE COURT:  You mean that decision that Judge Wright wrote his

4     opinion?

5          MR. NAZAIRE:  Yes, Your Honor.  I don't believe that was

6     sanctionable.  It was my opinion that it was not relevant.

7          THE COURT:  All right.  Okay.  Is that the only one you had an

8     objection to?

9          MR. NAZAIRE:  Well, I also object to the -- I didn't make an

10    objection, but for the time being, I have an objection to anything

11    that happens in Florida, especially as far as a grievance between

12    two -- between Mr. Syfert who's not part of this action.

13         THE COURT:  Well, I'll deal with each --

14         MR. NAZAIRE:  Yes, Your Honor.

15         THE COURT:  -- of those and deal with whether we're going to

16    consider them or not.  We'll do that right away.

17         MR. CHINTELLA:  I'm going to try to work with opposing

18    counsel, Your Honor, to resolve some of those issues, hopefully, too.

19         THE COURT:  Well, if you can do that right away, let us know.

20    We'll be happy to hear from you before you go home.

21         MR. NAZAIRE:  Your Honor, I'm sorry.  Can I make one request,

22    Your Honor?

23         THE COURT:  What's that?

24         MR. NAZAIRE:  I'm afraid of dealing with the defendant because

25    every time -- on a phone call, I'm afraid that I'm getting

1  tape-recorded.  I don't think that's fair to me, Your Honor, that I

2  don't know whether or not I'm being tape-recorded.

3          As far as if somebody's in New York, New York is a two-party

4  consent state, it's not a one-party consent state, and any national

5  across state -- interstate call, whether it's to one-party consent

6  states, it's illegal to tape-record somebody without that person's

7  permission.

8          I would just ask that anytime I contact Mr. Chintella

9  regarding discovery, if it's by phone, that it's not tape-recorded.

10  I feel very strange -- I don't want whatever I say to be cut in

11  pieces and then played back to make it seem that I said something

12  horrible.  And that's the only reason sometimes I don't return his

13  call is because he calls me for the purpose of tape-recording me to

14  create evidence, Your Honor.

15          As you said, you didn't go to the same law school as the

16  defendant's attorney did, but I don't believe attorneys should --

17  their whole case should be based upon a case that they've created

18  based upon their own conversations and what that attorney has

19  witnessed.

20          I just want the Court's guidance as to whether or not we can

21  tape-record each other.  I, for one, don't have any reason to

22  tape-record the defendant or his counsel.

23          MR. CHINTELLA:  Your Honor, I'm okay with not doing that.  But

24  the reason I initially did it is because counsel said they would not

25  object to setting aside the default and then they reversed that

1    position and essentially tried to get us to agree to a dismissal and
2    pay our own attorneys' fees.

3         We resisted that -- or my client did, and I consult with my
4    client on all these issues.  They resisted that because they felt the
5    lawsuit was unjust for all these reasons.  You know, I never -- we
6    had discussions generally, obviously, about these issues before this
7    hearing today and I never got an answer on any of these issues.

8         I didn't just call to make a recording, as he mentions, but I
9    sent emails that were not responded to, stuff like that as well.  So
10   I'm more than happy to do it if we can keep the lines of
11   communication open.  If it'll help that, then I'm fine with that.
12   But I would point out that it is not illegal.

13        THE COURT:  Well, there's no recording, as far as I know, in
14   this courtroom.  You can have your conversations when we recess.

15        MR. NAZAIRE:  Yes, Your Honor.

16        THE COURT:  You can begin those.

17        And we'll get something out very quickly as to -- so you know
18   what the Court will allow in the way of what's been tendered.

19        We'll set a date for a hearing after I see what's going on and
20   we get further down the line, but that may be shortly after that 60
21   days.  Sixty days was July, August -- that would be into September.
22   So we may try to hear it in September, October, one, depending upon
23   what my jury trial schedule will be at that time.

24        I was able to put this in because we've got jury trials
25   starting Monday and so we were able to get this in ahead of that and

1  we'll have to do the same thing.

2  I caution you, Counsel -- I mean, still going on is the

3  accusations against each other.  Just here in the last few minutes

4  each of you are making accusations against the other.

5  MR. CHINTELLA:  Your Honor, if I could -- if I could speak

6  really quick on that.

7  I would -- if I said something that was offensive or

8  unprofessional in my pleadings, it has not been drawn to my

9  attention.  I don't believe I've said anything on the scale of

10 mentioning criminal records or terrorist associations or analogies

11 that seem, to me, absurd.  I don't believe I've said anything along

12 those lines.  If I have, I'll --

13 THE COURT:  Well, both of you will take notice that your

14 conduct, anything less than professionalism within the rules of --

15 kinds of ethics, hurts you rather than helps you in this Court.

16 MR. NAZAIRE:  I've taken notice, Your Honor, and I promise it

17 will not happen again.

18 THE COURT:  You've got a long way to dig yourself back out.

19 MR. NAZAIRE:  I understand, Your Honor.

20 MR. CHINTELLA:  I will do the same, Your Honor, attempt to

21 always be professional.  There's the motion --

22 THE COURT:  Is there anything else either one of you wish to

23 say before we --

24 MR. CHINTELLA:  Real quick.  The Motion to Strike is still

25 pending.  I didn't know if it was possible to strike those things

1  from the public record, if the Court wanted to look at that issue yet

2  or not.

3      It was -- Mr. Nazaire is correct, there are a lot of people

4  who follow these cases very closely, and as soon as that hit it was

5  -- there was a big hoopla on the message boards and all that stuff,

6  and that's what I think the purpose of it was.  That's the reason I

7  mentioned the strike in the motion as well.

8      THE COURT:  You mean the accusations concerning a DUI?

9      MR. CHINTELLA:  The DUI, the mention of the EFF terrorist and

10  my association or shared goals with them.  And you mentioned one

11  other thing that wasn't directly at me, some analogies about

12  California.

13      MR. NAZAIRE:  Your Honor, I don't oppose any Motion to Strike

14  those that he's mentioned.

15      THE COURT:  Well, striking them just means they're stricken.

16  They'll still be in the record.  It's like the feathers out of a

17  pillow, once you shake them out, they can't be undone.  I mean,

18  they're still typed in there and they will be there.

19      MR. CHINTELLA:  And, Your Honor, the stuff about John Steele

20  and I, if that -- we would also argue that that is inflammatory and

21  should be stricken as well.  I'm willing to explain any facts

22  surrounding that, I have no idea.  I've spoken to John Steele once.

23      THE COURT:  Well, I'll deal with what's before me.

24      All right.  My law clerk reminds me that I had said at

25  lunchtime that I wanted to ask you, Mr. --

1        MR. CHINTELLA:  Yes, Your Honor.

2        THE COURT:  In regard to the disc you gave --

3        MR. CHINTELLA:  Yes, Your Honor.

4        THE COURT:  -- were you tendering that into evidence or what?

5        MR. CHINTELLA:  After what you just said, I should probably

6   take that back because if you wanted me to pick and choose which to

7   authenticate, because there are a lot of documents on there -- so I

8   think it would be confusing if you had to try and go through there

9   and pull out the ones that are cited in papers or whatnot.

10       THE COURT:  Well, it might be of help but if it's -- we're not

11  going to use it if you're not tendering it into evidence.

12       MR. NAZAIRE:  Your Honor, this is the first time I've seen it.

13  I'm not sure what's on here, Your Honor.

14       THE COURT:  Well, not totally.  We saw some of it, I think

15  this morning, but I don't know how much is on there that we didn't

16  see.

17       MR. NAZAIRE:  Yes, Your Honor.

18       MR. CHINTELLA:  There's stuff in there that I did attempt to

19  authenticate and there's stuff that we obviously didn't get to.

20  There's a lot of information on there.

21       THE COURT:  All right.  Now, again, I'm reluctant to leave

22  here without your knowing what you should be focusing on, because

23  it's not my intention to unleash either of you and that probably -- I

24  need to direct that more to the defendant than to the plaintiff

25  because plaintiff doesn't indicate they're going to do much in the

1  way of discovery.  And to attack nationwide on what's going on in

2  this field.

3       I do think that you should focus primarily on the matters

4  involving this lawsuit and whether it was an improper lawsuit where

5  there were -- it wasn't brought under Rule 11.  But I think there

6  are, possibly, some serious Rule 11 violations there -- or there may

7  be from what I've heard.  You should focus on whether the filing,

8  copyright filing and transfer.  In other words, that's the sound --

9  and anything relating to the alleged infringement to indicate whether

10 or not it was fraudulent or frivolous or not.

11      MR. CHINTELLA:  That would include, like, detection methods of

12 whether -- the evidence they got before filing the suit?

13      THE COURT:  Well, anything they had before filing suit -- I

14 mean, anything that's after suit has no bearing on whether the suit

15 was filed in good faith or bad faith.  If you get information

16 afterwards, that doesn't reflect on your intent or motives at the

17 time the lawsuit's filed.

18      I am concerned about this whole matter.  If we have anything

19 else, I'll try to outline it to you in written form in some way.  But

20 you better get about taking care of that, both of you.  We'll adjourn

21 until further order then.

22                  [proceedings concluded at 2:35 p.m.]

23

24

25

1  UNITED STATES DISTRICT COURT

2  NORTHERN DISTRICT OF GEORGIA

3  CERTIFICATE OF REPORTER

4

5      I do hereby certify that the foregoing pages are a true and

6  correct transcript of the proceedings taken down by me in the case

7  aforesaid.

8                  This the 19th day of August, 2013.

9

10

11                          /S/ Alicia B. Bagley
                            ALICIA B. BAGLEY, RMR, CRR
12                          OFFICIAL COURT REPORTER
                            (706) 378-4017
13

14

15

16

17

18

19

20

21

22

23

24

25